# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ACP MASTER, LTD., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 8508-VCL |
| | ) | |
| SPRINT CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ACP MASTER, LTD., *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | C.A. No. 9042-VCL. |
| | ) | |
| CLEARWIRE CORPORATION, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 25, 2017
Date Decided: July 21, 2017
Date Corrected: August 8, 2017

Stephen E. Jenkins, Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Lawrence S. Robbins, Kathryn S. Zecca, Ariel N. Lavinbuk, William J. Trunk, Joshua S. Bolian, Shai D. Bronshtein, Peter B. Siegal, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, LLP, Washington, DC, *Counsel for Plaintiffs ACP Master, Ltd., Aurelius Capital Master, Ltd., and Aurelius Opportunities Fund II, LLC*.

Robert S. Saunders, Jennifer C. Voss, Ronald N. Brown, III, Arthur R. Bookout, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Counsel for Defendants Sprint Corporation, Sprint Communications, Inc., and Respondent Clearwire Corporation*.

Donald J. Wolfe, Jr., Matthew E. Fischer, Christopher N. Kelly, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Erik J. Olson, MORRISON & FOERSTER LLP, Palo Alto, California; James P. Bennett, MORRISON & FOERSTER LLP, San Francisco, California; James E. Hough, MORRISON & FOERSTER LLP, Tokyo, Japan; James J. Beha II, MORRISON & FOERSTER LLP, New York, New York, *Counsel for Defendants Starburst I, Inc., and Softbank Corp.*

**LASTER, Vice Chancellor.**

In July 2013, Clearwire Corporation ("Clearwire" or the "Company") and Sprint Nextel Corporation ("Sprint") completed a merger in which Sprint paid $5.00 per share to acquire the 49.8% of Clearwire's equity that Sprint did not already own (the "Clearwire-Sprint Merger"). Sprint's acquisition of Clearwire was part of a broader effort by Softbank Corp. ("Softbank"), the largest telecommunications company in Japan, to enter the United States cellular telephone market. Contemporaneously with the closing of the Clearwire-Sprint Merger, Softbank acquired majority control of Sprint (the "Sprint-Softbank Transaction").

Entities associated with Aurelius Capital Management, LP (collectively, "Aurelius") held shares of Clearwire common stock when the Clearwire-Sprint Merger closed. Aurelius filed a plenary lawsuit which contended that the merger resulted from breaches of fiduciary duty by Sprint, aided and abetted by Softbank. Aurelius also filed a statutory appraisal proceeding. The cases were consolidated and tried.

For purposes of the plenary action, assuming that entire fairness is the governing standard of review, Sprint proved at trial that the Clearwire-Sprint Merger was entirely fair. Judgment is entered in Sprint's favor on the claim for breach of fiduciary duty and in Softbank's favor on the claim for aiding and abetting.

For purposes of the appraisal proceeding, Sprint proved that the fair value of the Company's common stock at the effective time of the Clearwire-Sprint Merger was $2.13 per share. Aurelius did not prove its more aggressive valuation contentions. Judgment in the appraisal proceeding is entered in favor of Aurelius for that amount, plus interest at the legal rate, compounded quarterly.

1

## I.   FACTUAL BACKGROUND

Trial lasted ten days. The parties introduced over 2,500 exhibits and lodged twenty-nine depositions. Eleven fact witnesses and seven experts testified live. The laudably thorough pre-trial order contained 547 paragraphs. The pre-trial and post-trial briefing totaled 766 pages. The following facts were proven by a preponderance of the evidence.

### A.   Clearwire

Clearwire was a small telecommunications company that had assembled a large block of 2.5 GHz spectrum. Its major stockholder was Eagle River Holdings, LLC, an affiliate of Craig McCaw, a cellular telephone pioneer.

Sprint had assembled another large block of 2.5 GHz spectrum. In 2008, as part of a complex, multi-party recapitalization, Sprint contributed its block to Clearwire and received a 51% ownership stake in the Company. Comcast, Intel, Time Warner Cable, BHN Spectrum Investments, and Google (collectively, the "Strategic Investors") contributed cash to Clearwire and received, collectively, a 22% ownership stake. Eagle River retained a 5% ownership stake. The remaining 22% was publicly traded.

As part of the recapitalization, Clearwire, Sprint, Eagle River, and the Strategic Investors entered into an Equityholders' Agreement.[1] It called for the Clearwire board of directors (the "Clearwire Board") to have thirteen members. Sprint could appoint seven directors, but one had to be independent of Sprint. Eagle River could appoint one director.

---

[1] JX 14, at 86. They also caused Clearwire to amend its certificate of incorporation to incorporate by reference the terms of the Equityholders' Agreement. PTO ¶ 100.

The Strategic Investors collectively could appoint four directors. Clearwire's Nominating Committee appointed the final director.[2] The Equityholders' Agreement required that any merger between Sprint and Clearwire prior to November 28, 2013 receive the approval of a majority of the shares unaffiliated with Sprint.[3]

With Sprint's 2.5 GHz holdings added to its own, Clearwire became the largest private holder of wireless spectrum in the United States. Clearwire used the cash it received from the Strategic Investors to build the world's first fourth generation (4G) mobile network. The plan was for Sprint and the Strategic Investors to buy capacity on Clearwire's network at wholesale rates, then resell or use it themselves. Sprint and Clearwire quickly concluded a capacity agreement (the "Wholesale Agreement"). The other Strategic Investors never did.

With Sprint as its only customer, Clearwire struggled to achieve consistent profitability. Clearwire's business prospects deteriorated further when the 4G standard Clearwire had chosen—WiMAX—lost out in the marketplace to a competing standard—Long-Term Evolution ("LTE").

In fall 2010, the Clearwire Board created a Strategic Committee charged with exploring alternatives for Clearwire. Its members were John Stanton, Theodore Schell, and

---

[2] JX 14, at 93-97.

[3] *Id.* at 150

Dennis Hersch. At the time, all were independent, outside directors.[4] They considered a variety of alternatives, including issuing debt, selling spectrum, and selling the Company as a whole.

In 2011, Stanton took the helm as Clearwire's Chairman and interim CEO. The Company's situation remained poor. Clearwire's auditors had added a going-concern qualification to its financial statements. In June 2011, Sprint gave back a portion of its Clearwire shares to lower its ownership to 49.8%, thereby ensuring that if Clearwire defaulted on its debt, it would not trigger a cross-default for Sprint. Clearwire's only path to survival required building an LTE network, but Clearwire lacked the necessary capital, and it was already burdened by debt from building its WiMAX network.

## B. Clearwire Turns To Sprint.

In summer 2011, Clearwire approached Sprint about switching its network from WiMAX to LTE. Clearwire mentioned a possible merger, but Sprint did not take up the invitation. The parties instead focused on renegotiating the Wholesale Agreement. In a version of buyer financing, Clearwire wanted Sprint to advance the payments it would make to purchase capacity on a fully built-out LTE network so that Clearwire could use those funds to construct the network. Clearwire also wanted Sprint to make minimum-purchase commitments. Sprint wanted Clearwire to lower its rates. The negotiations were contentious and dragged on into the fall.

---

[4] Stanton was technically Sprint's appointed independent director, but he had no ties to Sprint and had served as a director at McCaw's request.

4

In November 2011, after many bumps in the road, Sprint and Clearwire reached agreement on an amendment to the Wholesale Agreement. Sprint agreed to pay Clearwire $926 million for unlimited WiMAX services during 2012 and 2013 plus fees ranging from $5 to $6 per gigabyte for all other data sent over Clearwire's network. Sprint also agreed to help fund the build-out of an LTE network by making up to $350 million in prepayments for data capacity. The prepayments were conditioned on Clearwire having 5,000 LTE sites in service by the end of 2013, and 8,000 LTE sites in service by the end of 2014. The amendment gave Sprint a right of first refusal on any sale of Clearwire's "core spectrum."[5]

After Clearwire and Sprint amended the Wholesale Agreement, Clearwire's stock rebounded to $2.50 per share. Clearwire was able to raise $715.5 million through an equity offering. Clearwire also secured $295 million in debt financing.

But the good news was short-lived. In December 2011, three of the Strategic Investors (Comcast, Time Warner, and BHN) announced an agreement with Verizon that eliminated their need to buy capacity from Clearwire. A few months later, Google sold all of its Clearwire equity for $2.26 per share. Clearwire's efforts to find new customers

_____

[5] PTO ¶ 149. The definition of "core spectrum" was ambiguous and frequently a subject of dispute between Clearwire and Sprint. *See* Tr. 43:8-45:10 (Schell) (noting that "there were subjective as well as objective considerations" in determining whether spectrum was core or excess); JX 2196, Cochran Dep. 254:8-10 ("[W]hat constitutes excess spectrum [was] a complicated matter.").

continued to go nowhere. In the first half of 2012, Clearwire explored a variety of potential transactions with AT&T, T-Mobile, and MetroPCS. None of them bore fruit.[6]

At a meeting of the Clearwire Board on July 24, 2012, management told the Board that Clearwire had "sufficient cash to get through the first half of 2013" but would either need to slow the LTE network build or obtain additional financing to survive beyond that.[7] Management was not optimistic about other alternatives, stating: "We believe we have talked to every conceivable party with which to partner seriously in the last year," but without achieving any success.[8]

## C.    The Sprint-Softbank Transaction

Softbank's founder, chairman and CEO, Masayoshi Son, wanted to enter the U.S. cellular telephone market. In 2012, four players dominated that market: AT&T, Verizon, Sprint, and T-Mobile. AT&T and Verizon were the largest. Son wanted to acquire Sprint and T-Mobile, merge them into one company, and compete with AT&T and Verizon.

Son planned for the combined company to use Clearwire's 2.5 GHz spectrum. Softbank had successfully built a network in Japan using 2.5 GHz spectrum, and Son believed Softbank could do the same in the United States. Softbank singled out Clearwire's

---

[6] PTO ¶¶ 159-160, 162.

[7] JX 417 at 2.

[8] *Id.* at 6.

spectrum as "Key for Our Success in US."[9] Son planned for Sprint to acquire Clearwire so that Sprint could use the spectrum fully.[10]

In July 2012, Softbank began parallel negotiations with Sprint and T-Mobile. Sprint was receptive; T-Mobile was not. Although the idea of a three-party merger was put on hold, Son did not give up. He decided that Softbank would buy Sprint first.

In September 2012, Softbank and Sprint reached agreement on the Sprint-Softbank Transaction. Softbank would acquire a 70% stake in Sprint and provide Sprint with approximately $8 billion in capital. The plan contemplated Sprint using some of the capital to take Clearwire private. Softbank anticipated that Sprint would pay $2.00 per share to acquire the minority stake in Clearwire.[11]

To finance the Sprint-Softbank Transaction, Softbank needed to borrow approximately $18 billion. Softbank's lending syndicate conditioned the loan on Sprint having the right to appoint a majority of the members of the Clearwire Board.[12] The Equityholders' Agreement made this complicated, because it required that one of Sprint's designees be independent of Sprint. For complex reasons that are beyond the scope of this

---

[9] JX 530 at 29; *see also* JX 495 at 2 ("[Clearwire] spectrum is top priority strategically."); JX 498 at 2 (Sprint's board minutes noting that "Softbank's rationale for the transaction . . . included its ability to use [Clearwire's] 2.5 GHz spectrum for TD-LTE.").

[10] JX 530 at 4; *see* Tr. 861:17-867:20 (Son).

[11] *See* JX 487 at 24.

[12] PTO ¶ 192.

7

decision, Sprint concluded that the solution lay in buying the Clearwire shares owned by Eagle River or one of the Strategic Investors.

**D.      Sprint Approaches Clearwire and Eagle River.**

Sprint decided to try to reach agreement with Clearwire and with either Eagle River or one of the Strategic Investors before news of the Sprint-Softbank Transaction leaked. On October 5, 2012, Keith Cowan, Sprint's President of Strategic Planning, contacted Stanton and told him that Sprint "would consider making [an] offer for all [Clearwire] shares at [a] low price."[13] Without explaining why, Cowan told Stanton that the transaction was "urgent and needs to be done in the next 8-10 days."[14] Cowan asked Stanton to get the Strategic Investors and Eagle River to waive their right under the Equityholders' Agreement to have thirty days' advance notice before Sprint began negotiating a merger with Clearwire.

On October 8, 2012, Stanton met with Dan Hesse, Sprint's CEO, who "expresse[d] a strong desire" to buy Clearwire.[15] Like Cowan, Hesse emphasized that the matter was "urgent and needs to be done in the next two weeks," without telling Stanton why.[16] Stanton told Hesse that he thought the Clearwire Board would support a merger at $2.00 per share. At the time, Clearwire's stock was trading around $1.30 per share.

---

[13] JX 702.

[14] *Id.*

[15] *Id.*

[16] *Id.*

During the same period, members of Sprint management reached out to Eagle River and the Strategic Investors about buying their shares. The Sprint representatives did not disclose Softbank's interest in Sprint or its consequences for Clearwire.[17]

## E. The Sprint-Softbank Transaction Leaks.

On October 11, 2012, the news of the Sprint-Softbank Transaction appeared in the press.[18] Analysts speculated that Clearwire was an important part of Son's vision for Sprint. Clearwire's stock rose over 70% on October 11, closing at $2.22 per share.

Stanton called Hesse after the news broke. Given Clearwire's stock price, a deal at $2.00 no longer made sense. Stanton told Hesse that Sprint should make a "fair offer."[19] Hesse told Stanton that Sprint planned to buy out one of the Strategic Investors. Stanton reported the call to the Strategic Committee.[20] He expressed concern about Sprint buying out a Strategic Investor because it would let Sprint control the Clearwire Board: "[I]f Sprint appoints their insiders to our board . . . they will incrementally erode our ability to effectively serve our non-Sprint shareholders . . . ."[21]

The leak of the Sprint-Softbank Transaction caused Eagle River to realize that it had considerable bargaining leverage against Sprint. Exploiting its leverage, Eagle River

---

[17] *See, e.g.*, JX 563; JX 574; JX 580.

[18] JX 595; PTO ¶ 188.

[19] JX 602.

[20] JX 613.

[21] *Id.*

9

negotiated a sale of its block to Sprint at $2.97 per share. Under the Equityholders' Agreement, the other Strategic Investors had a right of first offer for the shares. None of them exercised their right.

**F.      Stanton Tries To Elicit An Offer From Sprint.**

Sprint and Softbank tried to respond to the leak about their transaction by pretending that they did not want to acquire Clearwire immediately. On October 13, 2012, Hesse and Cowan each spoke with Stanton and said that Sprint and Softbank had no plans to buy out Clearwire's minority stockholders.[22] Stanton asked to speak with a representative of Softbank, and Sprint arranged a call with Ronald Fisher, Softbank's Vice Chairman and one of Son's key deputies. In preparation for the call, Cowan advised Fisher to avoid tipping their hand:

> [Stanton] will want to engage you in direct discussions to buy the Company as quickly as possible after the announcement, or see whether you will support [Sprint] in engaging with them asap. Instead, I suggest that you indicate that your inclination is to take baby steps while your transaction with us is pending . . . while you are also willing to support some "lifeline" (i.e. dilutive) equity investments, and then be ready to consider a larger transaction (or not) once our deal closes. His reaction to that approach will tell you a lot, and potentially set a much better tone for any acquisition discussions.[23]

Stanton and Fisher spoke on October 15, 2012. Fisher stuck to the party line and told Stanton that Softbank and Sprint had no immediate plans to acquire Clearwire,

---

[22] JX 635; JX 636.

[23] JX 656 at 1-2.

10

although they did want to appoint additional representatives to the Clearwire Board. Stanton asked if he could meet with Son, and Fisher agreed.[24]

Stanton continued to think that a near-term deal with Sprint was in the best interests of Clearwire and its minority stockholders, so he tried to persuade Sprint and Softbank to make an offer. On October 22, 2012, he spoke with Fisher again.[25] Stanton told Fisher that the status quo was untenable and Clearwire would run out of money in less than a year. Stanton argued that renegotiating the Wholesale Agreement was a temporary fix. He told Fisher that a merger between Sprint and Clearwire was the only permanent solution.

Clearwire also tried to raise capital by selling spectrum. In October 2012, Clearwire exchanged proposals with DISH. DISH wanted to enter into the cellular wireless market and had recently purchased a large quantity of spectrum from several bankrupt wireless operators. DISH was in the process of obtaining approval from the FCC to deploy this spectrum, but it lacked a network of its own. DISH thus represented both a potential purchaser of Clearwire's spectrum and a potential strategic partner.

Clearwire also engaged in discussions with Qualcomm. When Hesse and Son got wind of Clearwire's discussions, they called various Qualcomm executives and told them that Sprint would have to approve any sale of Clearwire's spectrum. Stanton believed that Sprint and Softbank's calls "damaged [Clearwire's] credibility with Qualcomm and made

---

[24] JX 665.

[25] JX 729; JX 735.

it more difficult for us to do a transaction with them."[26] Stanton reported the incident to the Clearwire Board and expressed concern that "Sprint appears to be attempting to cut us off from our alternatives."[27]

## G.      The November 2 Meeting

On November 2, 2012, Stanton met with Son, Fisher, and Hesse in Palo Alto. Stanton made a detailed presentation designed to convince Son to acquire Clearwire.[28] He extolled the comparative advantages of a merger, estimating that it would yield $3 billion in synergies. He also attempted to put pressure on Sprint and Softbank by saying that Clearwire would have to sell its spectrum to raise capital without a merger. Rather than proposing a price, Stanton presented a range of values that ran from $2.11 per share (Clearwire's current market price) to $9.00 per share (a valuation implied from spectrum values ranging from $.17/MHz-pop to $.39/MHz-pop).[29]

Stanton recounted the price discussions in an e-mail he sent to the Strategic Committee on November 4.

> We then talked price. I asserted that Sprint had set a minimum price with their $2.97 per share agreement with Eagle River and said that regardless how that pricing came about, that our shareholders (particularly the [Strategic Investors]) would not accept a lower price than Eagle River. Dan [Hesse]

---

[26] JX 761; *see also* Tr. 1669:6-24 (Stanton).

[27] JX 761.

[28] *See* JX 807.

[29] *Id.* MHz-pop is a common industry metric for spectrum quantity, equal to the width of the spectrum band multiplied by the population in the geographic area covered by the license. PTO ¶ 72.

12

pushed back hard arguing that the undisturbed Clearwire price was $1.30 and that we should take a reasonable premium over that price . . . I also noted that our stock was already over $2.00 and that they had to pay a premium over that price. I responded that that current price reflects a market perception that there had previously been a significant risk of bankruptcy and that the Sprint-Softbank deal had effectively eliminated that risk and thus a much higher price was now expected . . . I also . . . pointed out that $2.97 was about 20₵ per MHZ pop which was reasonable based on other recent transactions. During this conversation they asked if Comcast and Intel would accept the $2.97 price to which I responded that I did not know, but that I was relatively certain they would not accept a lower price.[30]

Fisher and Son recalled the meeting differently. Fisher remembered Stanton saying, "At $2.97, I can deliver the shareholders. At $2.96, I cannot."[31] Son remembered the same statement, which he interpreted as a commitment to do a deal at $2.97 per share. Within hours of the November 2 meeting, a Sprint executive e-mailed his team: "Full speed ahead. Likely 2.97 per share. Start thinking about . . . modeling what the acquisition would look like."[32]

On November 5, 2012, the members of Clearwire's Strategic Committee and its Audit Committee held a combined meeting. The directors agreed on the need to establish a new independent committee to oversee negotiations with Sprint. They also agreed that Clearwire would need interim financing from Sprint as part of any deal to address its short-term liquidity needs.[33]

---

[30] JX 811.

[31] Tr. 975:9-12 (Fisher).

[32] JX 805 at 1.

[33] JX 816.

**H.     Softbank Lines Up Intel.**

Son wanted Sprint to acquire Clearwire before the Sprint-Softbank Transaction closed.[34] To move quickly, Sprint needed to convince the remaining Strategic Investors to waive their notice rights under the Equityholders' Agreement.

Intel was a Strategic Investor and the largest Clearwire stockholder after Sprint, with 12.9% of the non-Sprint shares. Sprint had antagonized Intel by attempting to buy its shares without disclosing its discussions with Softbank. Since then, Intel had refused to waive its notice rights.[35]

On November 7, 2012, Son called Paul Otellini, the CEO of Intel. Otellini recounted the meeting in an e-mail he sent to his deputies the following day:

> The heart of [Son's] request is our [C]learwire stock. He has been convinced by Dan [Hesse] and John [Stanton] that [Clearwire] will run out of money soon and needs to be recapitalized and they want to buy back the stock of the [S]trategic [I]nvestors before the [S]print deal closes 6 months from now.
>
> I told him we have no strategic reason to hold the stock, but that our selling it needs to be tied to a broader business arrangement with Softbank companies. We talked specifically about android handsets built for his networks in Japan, Indonesia . . . and Sprint. He needs 40M handsets a year to feed these carriers. He would like a strategic relationship with us to supply them along with tablets. He is interested in android at this time, but is very intrigued by the business [opportunity] that Taizen [*i.e.* an operating system used by Intel] represents.[36]

---

[34] *See* JX 874.

[35] *See* JX 629.

[36] JX 827 at 2.

14

The *quid pro quo* was simple and straightforward: Intel would support the Clearwire-Sprint Merger in return for a broader business arrangement with Softbank.

The next day, November 8, 2012, Son met with other Intel executives and agreed that Softbank would launch an Intel-based phone in three major countries in 2013.[37] On November 9, Otellini's deputy, Arvind Sodhani, told Fisher that Intel was prepared to support Sprint's acquisition of Clearwire and was looking forward to working with Softbank on "strategic opportunities."[38] On November 12, Sodhani advised Fisher that Intel had waived its notice rights. Sodhani told Fisher that Intel was very excited about "the strategic project that had been discussed with [Son]" and that "[t]o show their support for this new relationship, Intel would like to invest any proceeds" from the Clearwire-Sprint Merger in Softbank stock.[39]

## I.    Negotiations Begin.

On November 9, 2012, Hesse told Stanton that Sprint was working on an offer to acquire Clearwire's minority shares. Fisher called Stanton later that day to express Softbank's support.[40]

On November 13, 2012, the Clearwire Board formed a committee to negotiate with Sprint (the "Special Committee"). Its members were Hersch and Schell, who had served

---

[37] JX 845.

[38] JX 857.

[39] JX 867 at 1.

[40] PTO ¶ 221.

15

on the Strategic Committee, and Kathleen Rae, another outside director. None had any ties to Sprint. The Clearwire Board resolved that it would not authorize or approve a transaction with Sprint without the Special Committee's affirmative recommendation. The Special Committee expected the negotiations to be straightforward. As Schell put it at the time, "[T]here isn't going to be a process of soliciting other buyers; it's not a competitive deal . . . its [sic] a price negotiation and we kind of even know where we are going to wind up on it."[41]

The Special Committee decided to have Stanton lead the negotiations with Sprint because he was a "legendary figure in the telecommunications world" who "would have enormous credibility and impact in negotiating with Sprint and Softbank."[42] Stanton thought he could generate a competitive dynamic with Sprint by finding buyers for Clearwire's spectrum.[43] On November 14, 2012, Clearwire sent DISH a non-binding term sheet for a spectrum sale. DISH told Clearwire that it needed to receive FCC approval of a pending application for its satellite spectrum before it could engage.[44]

On November 21, 2013, Sprint sent Clearwire its initial offer of $2.60 per share. The price represented a 22% premium over Clearwire's closing price of $2.12 per share on

---

[41] JX 888.

[42] Tr. 208:23-209:5 (Hersch); *accord* Tr. at 77:22-78:7 (Schell).

[43] *See* JX 873.

[44] PTO ¶ 228.

the prior day. As part of the deal, Sprint proposed to provide Clearwire with up to $600 million in debt financing, convertible into Clearwire stock at $1.25 per share.

On December 3, 2013, the Special Committee met to consider Sprint's proposal and discuss alternatives. One option was a spectrum sale, but although that alternative would provide some immediate liquidity, "it would not solve [Clearwire's] longer-term liquidity needs . . . ."[45] Another option was bankruptcy, but the Special Committee thought that "it was difficult to expect greater equity value in a restructuring transaction than Sprint's initial $2.60 per share proposal."[46] The Special Committee decided to counter at $3.15 per share. The Special Committee also asked for $800 million in interim financing and an exchange rate of $2.20 per share.[47]

## J.     The Accelerated Build

Also on December 3, 2012, Sprint representatives informed Stanton that Softbank wanted to dramatically expand Clearwire's LTE network build beyond what was contemplated by the Wholesale Agreement (the "Accelerated Build"). Clearwire's current plan had anticipated 5,000 new sites by the end of 2013; Softbank wanted Clearwire to build 12,500 sites.[48] Sprint and Softbank offered to finance the incremental sites and "to

---

[45] JX 1018 at 2.

[46] *Id.*

[47] PTO ¶ 241.

[48] JX 1033 at 1.

17

increase their revenue commitment to [Clearwire] to cover the continuing costs of long term operation of those sites in the event the deal did not close, for any reason."[49]

The Accelerated Build represented a huge undertaking for Sprint.[50] On December 4, 2012, Stanton told Hesse that Clearwire was "more than happy to discuss" the Accelerated Build but that the parties needed "to get on the same page."[51] Stanton noted that although the Sprint representatives had mentioned building 7,500 additional sites, Sprint's formal proposal contemplated building as many as 11,000 additional sites, for a total of 16,000 new sites in 2013.[52] Stanton proposed that Clearwire and Sprint first finish negotiating the Clearwire-Sprint Merger.

On December 6, 2012, Sprint raised its offer for Clearwire to $2.80 per share. Sprint agreed to increase the amount of interim debt financing to $800 million but would only increase the conversion price to $1.50 per share.[53] On the same day, DISH offered to buy approximately 11.4 billion MHz-pops of spectrum from Clearwire for approximately $2.2 billion, with an option to purchase or lease additional spectrum.[54]

---

[49] *Id.*

[50] *Id.* at 1-2.

[51] JX 1043 at 1-2.

[52] *Id.*

[53] PTO ¶ 243.

[54] *Id.* ¶ 244.

18

On December 7, 2012, the Special Committee directed Stanton to continue negotiating with Sprint and to reiterate Clearwire's demand for $3.15 per share.[55] Two days later, Sprint increased its offer to $2.90 per share. The Special Committee again stood firm at $3.15 per share.[56]

On December 11, 2012, Sprint completed its purchase of shares from Eagle River for $2.97 per share. After the purchase, Sprint controlled 50.4% of Clearwire's voting power.[57]

## K.    Son Draws a Line in the Sand.

When Son learned that the Special Committee was continuing to demand $3.15 per share, he was furious.[58] Son believed that Stanton "had made a commitment to [him] in California to do this deal at $2.97."[59] Fisher relayed Son's reaction to Stanton, who informed the Special Committee that Softbank "would approve an offer at $2.97 per share and would not offer a higher price 'as a matter of principle.'"[60]

---

[55] JX 1067.

[56] JX 1088.

[57] PTO ¶ 252.

[58] *See* JX 1136 (Fisher telling Hesse that Son "just went off on a 'rant' saying that at $2.98 we can tell John that he won't approve the deal. He is really pissed at John about raising it.").

[59] Tr. 808:15-19 (Son).

[60] JX 1145.

Rather than immediately accepting Son's price, Clearwire continued to explore the alternative of selling spectrum.[61] After DISH refused to increase its offer, Clearwire reached out to other parties, including Google. Google said it wasn't interested in a transaction.[62] Google actually was interested, but Google had contacted Sprint previously about Clearwire's spectrum, and Sprint convinced Google to wait until after Sprint and Softbank acquired Clearwire.[63]

On December 16, 2012, the members of Clearwire's Special Committee and its Audit Committee held a joint meeting.[64] The committees received a fairness opinion from Centerview, the Special Committee's financial advisor. Centerview compared the $2.97 per share price to numerous metrics for valuing Clearwire. These metrics included a discounted cash flow ("DCF") analysis of two sets of revenue projections prepared by Clearwire's management in the ordinary course of business. The first set of projections were the Single Customer Case, which assumed that Sprint would remain Clearwire's only major wholesale customer. The second set of projections were the Multi Customer Case, which assumed that Clearwire would obtain additional wholesale customers and therefore additional revenue.

---

[61] *See* JX 1152 (Stanton telling Hesse that Clearwire has "a written offer for our spectrum").

[62] JX 1171; PTO ¶ 266.

[63] JX 1050 at 1.

[64] *See* JX 1206.

20

Sprint also prepared internal projections of its wholesale payments to Clearwire. Sprint did not provide its own projections to the Special Committee during the negotiations of the Clearwire-Sprint Merger. Consequently, Centerview did not consider Sprint's internal projections in its fairness opinion.

Centerview's DCF analysis under the Multi Customer Case indicated that Clearwire's value exceeded Sprint's $2.97 per share offer. The Special Committee recognized, however, that the Multi Customer Case was not a viable plan because Clearwire "still didn't have any prospect of having a second customer."[65] The Special Committee and Centerview both regarded the Single Customer Case as Clearwire's operative reality. Centerview's DCF analysis under the Single Customer Case indicated that Clearwire's value was no greater than $0.75 per share. Centerview therefore concluded that Sprint's offer was fair to Clearwire's minority stockholders.

Supported by Centerview's fairness opinion, the Special Committee resolved that $2.97 per share was a fair price for Clearwire and recommended that the Clearwire Board approve the Clearwire-Sprint Merger. Immediately following the joint meeting, the Clearwire Board met and adopted the Special Committee's recommendation.

---

[65] Tr. 1510:11-12 (Stanton); *see also* Tr. 82:17-83:16 (Schell) (Clearwire "did not find another credible, if any, opportunity" for additional customers despite "having talked to every conceivable party who may be interested"); Tr. 217:13-21 (Hersch) ("[W]e only had a single customer and no prospect of a second . . . .").

On December 17, 2012, Clearwire and Sprint signed a merger agreement. As required by the Equityholders' Agreement, the Clearwire-Sprint Merger was conditioned on approval of a vote of a majority of the non-Sprint shares.

In a related agreement, Sprint agreed to provide Clearwire with up to $800 million in interim financing (the "Note Purchase Agreement"). Clearwire could draw on the financing in ten monthly installments of $80 million. The resulting notes had a 1% coupon and could be converted into Clearwire shares at $1.50 per share.

Intel and the other Strategic Investors entered into a Voting and Support Agreement with Sprint and an accompanying Right of First Offer Agreement. In the Voting and Support Agreement, the Strategic Investors committed to vote for the Clearwire-Sprint Merger. In the Right of First Offer Agreement, Sprint committed to buy, and the Strategic Investors to sell their shares at the price offered in the merger agreement if the merger did not close.[66]

## L.     Reactions To The Merger

Clearwire's investors reacted negatively to the Clearwire-Sprint Merger. Investors told Clearwire that the price of $2.97 per share was inadequate. They also objected to the Note Purchase Agreement as "dilutive and coercive."[67] On December 21, 2012, Hesse

---

[66] PTO ¶ 275; JX 1632, Annex C.

[67] JX 1241 at 5; *see also* JX 1226 at 1 (Clearwire's Chief Financial Officer to Hersch: "Getting a lot of pushback on why we accepted the terms of the convert (e.g. they seem too friendly to Sprint and coercive).").

reported to Son and Fisher that "[t]he activism of the dissident [Clearwire] shareholders is apparently picking up, not only buying shares but reaching out to other [Clearwire] equity holders to vote against the transaction."[68]

DISH's reaction to the Clearwire-Sprint Merger was more consequential. On December 28, 2012, DISH proposed to tender for up to 100% of Clearwire's outstanding common stock at $3.30 per share. DISH also offered to provide Clearwire with interim financing in lieu of the Note Purchase Agreement. DISH conditioned its offer on receiving the right to appoint directors to the Clearwire Board and other governance rights, including the right to veto "material transactions with related parties (including Sprint) unless these transactions were approved by [a committee of independent directors]."[69] Alternatively, DISH proposed to buy 11.4 billion MHz-pops of Clearwire's spectrum for $2.18 billion.

DISH's intervention at $3.30 per share changed the negotiating landscape. The Special Committee instructed Stanton to engage with DISH.[70] DISH's appearance also energized stockholder opposition to the merger.

## M. Negotiations With DISH End.

DISH's demands for governance rights ran contrary to the terms of the Equityholders' Agreement. Throughout January and February 2013, the Special Committee analyzed how DISH could make an actionable proposal. The Special

---

[68] JX 1273.

[69] JX 1292 at 5; *see also* PTO ¶ 281.

[70] JX 1290; PTO ¶ 282.

Committee believed that "[t]he key to leveraging" Softbank and Sprint was "to figure out what we can deliver to [DISH] in terms of governance, etc."[71] To signal the sincerity of their effort, the Special Committee caused Clearwire to decline the January and February draws under the Note Purchase Agreement.[72]

By February 2013, however, the Special Committee had come to doubt its ability to navigate around Sprint's contractual rights. On February 26, the Special Committee decided that Clearwire would accept the March draw under the Note Purchase Agreement.[73] DISH expressed its strong disapproval and terminated discussions.[74]

With DISH out of the picture, Clearwire scheduled the stockholder vote on the merger for May 21, 2013. Clearwire subsequently accepted the April draw under the Note Purchase Agreement."[75]

## N.    Two New Developments

In April 2013, the Special Committee confronted two new developments. The first was an alternative source of interim financing. Aurelius, the plaintiff in this case, and Crest, another large stockholder that had already sued Sprint and Clearwire's directors for breaching their fiduciary duties in connection with the Clearwire-Sprint Merger, offered

---

[71] JX 1304.

[72] JX 1290; JX 1434; *see also* PTO ¶¶ 282, 292.

[73] JX 1508; *see also* PTO ¶297.

[74] JX 1522.

[75] JX 1551 at 2; PTO ¶ 301.

Clearwire $320 million in debt financing, convertible into Clearwire equity at $2.00 per share.[76] The conversion price was superior to the Note Purchase Agreement, so the Special Committee asked Sprint to waive its blocking rights and permit Clearwire to access the financing. Sprint refused.[77]

The second development was an offer from Verizon to buy spectrum leases held by Clearwire for the twenty-five largest markets in the United States, covering approximately 5 billion MHz-pops. Verizon's proposal valued Clearwire's spectrum between $.22 and $.30 per MHz-pop.[78] The Special Committee directed management to engage with Verizon, but doubted that a spectrum sale "could resolve the fundamental liquidity issues [Clearwire] faced . . . ."[79] In addition, Sprint had the right under the Wholesale Agreement to veto any sale of Clearwire's core spectrum, making the transaction non-viable unless Sprint consented.

## O.    DISH Re-Engages.

After dropping off the map for more than a month, DISH reemerged in April 2013 with a surprising new tactic. On April 15, 2013, DISH submitted an unsolicited proposal to Sprint's board of directors for a merger between DISH and Sprint.[80] DISH thought that

---

[76] *See* JX 1568, 1580; PTO ¶¶ 305, 309.

[77] JX 1577; PTO ¶ 311.

[78] JX 1579 at 2; PTO ¶ 308.

[79] JX 1577 at 1.

[80] JX 1599 at 3.

25

its merger proposal would encourage Clearwire's stockholders to vote down the Clearwire-Sprint Merger, and that Clearwire would then file for bankruptcy. Because DISH had accumulated a large stake in Clearwire's debt, it could then acquire Clearwire's spectrum cheaply through a bankruptcy auction.

Stanton tried to use DISH's involvement to extract a price increase. On April 16, 2013, Stanton explained to Fisher and Hesse that DISH "now holds a blocking position in several classes of [Clearwire's] debt securities" and that if Clearwire's stockholders "vote no on our transaction . . . Dish has the strongest position to buy the assets of the company."[81] Stanton also reported that stockholders remained opposed to the merger.[82] Stanton exhorted Fisher and Hesse "to increase your price soon."[83] But Sprint and Softbank continued to resist a price increase.[84]

## P. Clearwire and Sprint Solicit Stockholder Support.

On April 23, 2013, Clearwire and Sprint filed a joint definitive proxy statement in support of the Clearwire-Sprint Merger.[85] In the section explaining its recommendation in favor of the merger, the Special Committee told stockholders that $2.97 per share was a

---

[81] JX 1604 at 1; *see also* JX 1611.

[82] JX 1604 at 1 (Stanton explaining that he had met with eleven large stockholders and "all but two . . . told us that they would vote against our merger with Sprint if the price is not raised above $2.97").

[83] *Id.*

[84] *See* JX 1650; JX 1655.

[85] JX 1632.

26

fair price and that the merger was "more favorable to our unaffiliated stockholders when compared with other strategic alternatives . . . ."[86] Sprint similarly recommended the merger as "substantively and procedurally fair to [Clearwire's] unaffiliated stockholders . . . ."[87] Sprint justified this claim by pointing to "the fact that Comcast, [BHN] and Intel, who collectively own approximately 13% of the Company's voting shares . . . have agreed to vote their shares in favor of the Merger Agreement . . . ."[88]

On May 3, 2013, four large Clearwire stockholders—Mount Kellett, Glenview Capital, Highside Capital, and Chesapeake Partners—formed a group to oppose the merger.[89] They collectively held a significant percentage of Clearwire's unaffiliated shares.[90] The parties called them the "Gang of Four."

On May 5, 2013, the Finance Committee of Sprint's board of directors held a meeting. Michael Schwartz, Sprint's head of corporate development, "proposed that the Committee consider either increasing the consideration offered to Clearwire's shareholders

---

[86] *Id.* at 52.

[87] *Id.* at 58.

[88] *Id.*

[89] JX 1671 at 14.

[90] Their collective ownership interest in Clearwire fluctuated with market trading, but it appears to have at all times exceeded 20% of Clearwire's unaffiliated shares. *Compare* JX 1671 at 15 (disclosing a combined ownership interest of "18.2% of the total number of Class A shares outstanding" as of May 3, 2013); PTO ¶ 361 (showing a combined ownership interest of 23.8% of the unaffiliated shares as of June 12, 2013); PTO ¶ 393 (showing a combined ownership interest of 23.3% of the unaffiliated shares as of July 9, 2013).

. . . or arrange for financing to help prevent a Clearwire bankruptcy in the event of a 'no' vote."[91] Schwartz reasoned as follows:

- "Without a Clearwire acquisition, Sprint will have to pay for both (1) capacity on the Clearwire network (current agreement is $5-6 per GB) plus (2) what could be significant fees to secure access to deploy 2.5 GHz spectrum [on] the Sprint network. Such payments could exceed the build out and operating costs that would be incurred if transaction closes."

- "Sprint plans to rapidly deploy 2.5 GHz LTE."

- "Clearwire could take certain actions that would most likely result in significant delays to network development."

- "[S]print may transfer value to other shareholders through wholesale payments (~33% of every $1 based on no-vote ownership) plus spectrum lease payments."

- "Clearwire may become more valuable as Sprint traffic and payments increase."[92]

Schwartz told the Finance Committee that Clearwire would require additional funding if the Clearwire-Sprint Merger was rejected or delayed. He proposed that Sprint issue $1 billion in convertible debt at an exchange price of $2.00 per share.[93]

After Schwartz's presentation, the Finance Committee "recommended that management increase the consideration offered to Clearwire shareholders to $3.50 per share, subject to Softbank's consent . . . ." The Finance Committee also resolved to "continue to work on the financing plan" as a fallback.[94]

---

[91] JX 1675 at 2.

[92] JX 1674 at 7.

[93] *Id.* at 10.

[94] JX 1675 at 2.

## Q. Son's Roadshow Backfires.

While Sprint was trying to marshal stockholder support for the Clearwire-Sprint Merger, Softbank was trying to marshal stockholder support for the Sprint-Softbank Transaction. On May 8-10, 2013, Son and Fisher met with a series of large Sprint stockholders. Many of the investors also held large positions in Clearwire.

In an effort to convince the investors to support the Sprint-Softbank Transaction, Son spoke of his vision for Sprint and its ability to use Clearwire's spectrum. He described Clearwire as "The Treasure" and explained that his "path to achieving his 300-year vision leads to [Clearwire].[95] He also contradicted arguments that Clearwire and Sprint had been making in favor of their deal. For example, he told the investors that new technology "would allow [Softbank] to build out 2.5 spectrum at significantly lower capex," which undermined Clearwire and Sprint's arguments that the 2.5 GHz spectrum was not as valuable as other bands.[96] He told investors that Clearwire was "essential to his strategy and as a result, they would not [Clearwire] go bankrupt,"[97] which undercut Cleawire and Sprint's arguments about Clearwire's financial viability. He also told the investors that if the Clearwire-Sprint Merger failed, "any subsequent deal to acquire the [Clearwire]

---

[95] JX 1767.

[96] *Id.*

[97] JX 1689.

29

minority stake would be structured so they wouldn't require a majority of the minority and shareholders could pursue appraisal rights if they didn't agree with the takeout price."[98]

Son's candor doomed the stockholder vote on the Clearwire-Sprint Merger. On May 15, 2013, Stanton told Hesse and Fisher that the "vote will fail."[99] Stanton urged Sprint and Softbank to increase their price. He told Hesse and Fisher that, if the merger was voted down, the Clearwire Board was considering defaulting on a $250 million interest payment due on June 1.

## R.    Sprint Increases Its Offer.

Faced with a certain no-vote, Softbank relented and agreed to a price increase. On May 20, 2013, Sprint increased its offer to $3.40 per share, telling Clearwire that it was its "best and final offer."[100] On May 21, Clearwire convened its meeting of stockholders and immediately adjourned the vote until May 31.[101]

But the bump was not enough for Clearwire's dissident stockholders, many of whom had heard Son's presentations about the value of Clearwire. Citing Son's comments, they told Stanton that they believed Clearwire's value to be still higher.[102] In an e-mail, Stanton told Hesse and Fisher that one large stockholder was "on the fence at 2.97" before Son's

---

[98] *Id.*

[99] JX 1723.

[100] JX 1744 at 3; *see also* PTO ¶ 334.

[101] JX 1738; *see also* PTO ¶ 338.

[102] *See, e.g.*, JX 1744 at 3; JX 1747; JX 1748; JX 1806.

roadshow, but now believed that "Clearwire was worth \$4-5."[103] Exasperated, Hesse replied to Fisher: "omg."[104]

At Stanton's behest, Fisher agreed to "keep [Son] away from shareholders" until after the stockholder vote.[105] From that point on, Fisher took the lead for Softbank in speaking with Clearwire stockholders. Together, Sprint and Softbank adopted a carrot-and-stick approach: emphasize the financial benefits of the Clearwire-Sprint Merger, while also threaten to take control of the Clearwire Board and dilute the minority stockholders if they voted down the merger. Sprint's talking points for investor calls highlight the latter dimension of the strategy.

> While we have no specific board approved plan in the event of a no vote, we would likely do a mix of the following:
>
> 1.   Provide convertible/exchangeable capital at conversion/exchange prices significantly below the original \$2.97/offer. We would expect to offer the public pro-rata participation in these down rounds.
>
> 2.   We would expect this process to be executed repeatedly over time.
>
> 3. We would expect to designate our rights with respect to board governance (designate 7 Sprint representatives).
>
> 4. We would expect to buy the [Strategic Investors'] shares (this would raise Sprint's ownership to 68%).

---

[103] JX 1772.

[104] *Id.*

[105] JX 1784 at 2.

5. Once the standstill [in the Equityholders' Agreement] expires in November, we may, from time to time, make open market purchases or provide tender offers in order to provide liquidity in market.[106]

Fisher and Stanton successfully persuaded a few large stockholders to support the Clearwire-Sprint Merger at $3.40 per share. Nonetheless, it appeared that Clearwire's stockholders would still vote down the merger.[107]

## S.    DISH Tops Again.

For a third time, DISH shook up the deal landscape. On May 29, 2013, DISH offered to purchase up to 100% of Clearwire's shares for $4.40 per share.[108] DISH conditioned its offer on receiving the same governance protections it had asked for in January, but DISH did not condition its offer "on the absence or failure of" any challenge by Sprint to DISH's requested governance rights.[109] DISH also offered interim financing of up to $80 million per month exchangeable at $2.50 per share.

During a meeting on May 30, 2013, the Special Committee resolved to (i) adjourn the stockholder meeting until at least June 13, (ii) make the June 1 interest payment on

---

[106] JX 1801 at 2-3; *see also* JX 1795 (Fisher telling investor that "over the next couple of years we think we can increase our ownership at a much lower valuation.").

[107] *See* JX 1805; JX 1823.

[108] JX 1817; PTO ¶ 345.

[109] *Id.*

Clearwire's debt, and (iii) decline the $80 million June draw under the Note Purchase Agreement.[110]

Sprint's board of directors also met on May 30, 2013. Management gave a presentation that outlined the components of Sprint's plans in the event of a no vote:

- "Execute plan to name new Sprint Directors (7 of 13)."

- "To avoid potential cross-default risk, Sprint plans to reduce voting interest below 50%, similar to what has been done in the past."

- "[P]rovide Clearwire with $320 million of financing to insure Clearwire makes [its] June 1 interest payment."

- "Financing will be required for Clearwire to continue operating in 2013, make the December interest payment, and continue operations into 2014 (approximately $1B)."

- "MVNO Agreement – Sprint's existing agreement to purchase 4G capacity from Clearwire is perpetual; 2014 and beyond pricing is $6 per GB declining to $5 per GB based on volume; 2014 4G payments estimated to be approximately ~$500M, subject to Clearwire build-out and Sprint customer usage."

- "Spectrum Use Agreement – to execute our current strategy, we will need to negotiate an agreement to buy, lease, or deploy on Clearwire spectrum."[111]

Management elaborated on Sprint's options with a decision tree. Sprint's "mid-to-long term plan" in the decision tree flowed to two options: "Restructuring" and "Status Quo." The following items were listed under "Status Quo:"

- "Exercise all rights (e.g. change board)."

- "Ongoing financing of ~$1B for first year."

---

[110] JX 1831; PTO ¶ 348.

[111] JX 1840 at 38 (punctuation added).

33

- "Consider offering to re-finance Clearwire's [$2.9 billion] callable debt . . . which is secured by spectrum."

- "Negotiate an agreement to gain access to 2.5 GHz on Sprint sites."

- "Attempt to renegotiate MVNO rates."

- "Consider increasing ownership stake post Standstill (Nov[ember] 2013)."

- "Concerns regarding viability of Clearwire as a standalone entity without additional wholesale customers or financing."[112]

On June 5, 2013, the Special Committee and the Clearwire Board changed their recommendation on the Clearwire-Sprint Merger.[113] Hersch told Stanton that the move "maximize[s] our leverage with Sprint . . . and improve[s] our chances of getting a bump."[114]

## T.    Sprint And Softbank Consider Whether To Bump Again.

DISH's tender offer exposed a fault line between Softbank and Sprint. Sprint wanted to top DISH's offer. Softbank did not. Topping DISH's offer would increase the total price for Clearwire by at least $1 billion, which Softbank felt was "a big number for a company that . . . was burning cash and had high leverage."[115] Softbank had often left a public float

---

[112] *Id.* at 40 (punctuation added).

[113] JX 1860, 1861; PTO ¶¶ 351-352.

[114] JX 1862.

[115] Tr. 935:11-13 (Fisher).

in companies where it acquired control (including in its then-pending Sprint-Softbank Transaction), and Son was comfortable with Sprint doing the same with Clearwire.[116]

Faced with a likely no-vote, Sprint took a hard look at its ability to achieve Son's vision if Sprint did not own Clearwire. Led by Schwartz, employees from Sprint's finance, network, and corporate development groups spent two weeks analyzing possible scenarios. They summarized their work in a PowerPoint presentation titled "Clearwire Alternatives," which Hesse requested to help convince Fisher and Son to top DISH's bid.[117] The presentation discussed four options.

The first option was to increase the merger consideration and acquire Clearwire. The presentation outlined the cost of topping DISH's bid at various price points.

The second option was to not acquire Clearwire but still use Clearwire's spectrum as if Sprint owned Clearwire. This scenario was called the "Full Build." Schwartz described its creation as a "mechanical exercise"[118] in which he assumed (i) consummation of the Sprint-Softbank Transaction, (ii) consummation of the Clearwire-Sprint Merger, and (iii) rapid deployment of 2.5 GHz LTE spectrum on 38,000 sites, which was what Softbank planned to do if the Clearwire-Sprint Merger succeeded. Schwartz then backed out merger-

---

[116] *See* Tr. 761:10-21 (Son).

[117] JX 1915; Tr. 634:24-635:4 (Schwartz).

[118] Tr. 545:17-19.

35

related costs and made various assumptions about the terms on which Sprint would use Clearwire's spectrum as a wholesale purchaser.

The third option was to not acquire Clearwire and only build out Clearwire's spectrum to the extent envisioned by the Wholesale Agreement. This was called the "Limited Build." It assumed: (i) Sprint's "current sub[scriber] forecast," (ii) Sprint's "current [forecasted] tonnage growth", (iii) Sprint's "current spectrum holdings," and (iv) Clearwire's construction of 5300 LTE sites by the end of 2013.[119] Sprint also modeled a variation of the Limited Build where Clearwire constructed 8000 LTE sites.

The fourth option was to find other spectrum that Sprint might use to satisfy network demands. None of the alternatives were viable. Son described them as either "stupid," "too expensive," or "wouldn't work."[120]

To my eye, the Clearwire Alternatives presentation seems designed to lead a reader to the conclusion that the only rational path was to increase the merger price, which was what Sprint wanted. Son had his chief technology officer analyze the presentation.[121] He told Son that the Full Build was "difficult to understand since a detailed calculation is not

---

[119] JX 1915 at 5.

[120] Tr. 851:1-857:11 (Son).

[121] *See* JX 1961 (translation).

available . . . , but [my] feeling is, 'really?'"[122] He agreed that the Limited Build was feasible, but cautioned that it provided at best a "temporary solution."[123]

Sprint's board of directors was scheduled to meet on June 17, 2013. To prepare for the meeting, Schwartz and the corporate development team created detailed financial models for Sprint under the Full Build and the Limited Build.[124] They also created a full set of projections for Clearwire's standalone business under the Full Build (the "Full Build Projections").[125] Clearwire's revenue under the Full Build Projections far exceeded its revenue under any other set of projections. The Full Build Projections forecasted that Sprint would pay Clearwire $20.9 billion in wholesale payments from 2013 to 2018, compared to $4.7 billion under the Single Customer Case prepared by Clearwire's management.

Schwartz's team also modeled Sprint's financial profile under the Limited Build. Contrary to Schwartz's expectations, their model indicated that the Limited Build was financially superior to the Full Build. The projected loss of subscribers under the Limited Build was "more than offset by the savings from the much lower 2.5 tonnage and resulting payment to [Clearwire]."[126] Both the Full Build and the Limited Build, however, were

---

[122] JX 1962 (translation).

[123] *Id.*

[124] Tr. 520:19-23 (Schwartz).

[125] JX 1983.

[126] JX 1985 at 1.

"materially worse than the scenarios where the [Clearwire] deal closes."[127] Sprint's best option was to increase its offer for Clearwire.

## U.     Sprint Decides to Increase Its Offer Again.

On June 17, 2013, Sprint's board of directors met as scheduled. Schwartz attended the meeting and gave a presentation to the board. A slide titled "Rationale for Updated Approach" listed several justifications for increasing the merger consideration:

- "Sprint's preference is to acquire 100% of Clearwire, but with a fall back position if that was not possible, Sprint could reasonably expect to enter into a commercial agreement that would provide access to 2.5 GHz. There was also a possible path to acquiring Clearwire at a later date at a reasonable price."

- "Dish tender creates a significant risk to this plan. If Dish obtains its desired stake and some or all of its desired governance rights, Sprint may not be able to (1) enter into a commercially reasonable agreement with Clearwire to access 2.5GHz, and (2) acquire the remaining stake in Clearwire at a reasonable price."

- "There has been no change to the intrinsic value of Clearwire . . . All estimates of Clearwire [sic] value using traditional DCF methodologies, including Clearwire's Single Customer Case (Clearwire has stated that its Multi Customer Case does not appear viable) provide values well below Sprint's initial offer to Clearwire."

- "Given Sprint's current network deployment plan, a successful Dish tender could create substantial 'hold up' value. Dish's potential ability to block Sprint's current plans could create a negative impact on Sprint that exceeds Clearwire's value, while also destroying value for Sprint."[128]

Schwartz did not present the financial models he developed. Sprint's board agreed to authorize an increase in the merger consideration to $5.00 per share without seeing the Full Build Projections.

---

[127] *Id.*

[128] JX 1981 at 19.

## V. The Final Merger Consideration

Also on June 17, 2013, Sprint sued DISH and Clearwire in this court, alleging that DISH's tender offer violated Sprint's contractual rights under the Equityholders' Agreement and Delaware law. On June 18, DISH rescinded its proposed merger with Sprint and announced that it would instead "focus [its] efforts and resources on completing the Clearwire tender offer."[129]

On June 19, 2013, Fisher spoke with representatives of the Gang of Four. They agreed to support the Clearwire-Sprint Merger at $5.00 per share.[130] Fisher relayed the news to Son, telling him: "This is a higher price than what I would have liked but we eventually agreed to settle on this as a price that neither of us are happy with, but gets the deal done." Fisher added that he and Sprint "have also spoked to Intel and Comcast and have their support . . . Together with the shareholders that have already voted in favor, this should get us to over 50%.[131]

On June 19, 2013, Sprint provided Clearwire with a revised merger agreement that increased the merger consideration to $5.00 per share. In return, Sprint required that Clearwire "terminate all discussions with [DISH]" and issue a press release stating that the

---

[129] JX 1991; PTO ¶ 368.

[130] JX 2026; PTO ¶¶ 377

[131] JX 2012.

Special Committee and the Board had reinstated their recommendation in favor of the Clearwire-Sprint Merger and against the DISH tender offer.[132]

On June 19, 2013, the Special Committee considered the revised merger agreement. The Special Committee members acknowledged that the revised merger agreement would preclude further negotiations with DISH but concluded that "the benefits of locking in the $5.00 per share proposal from Sprint . . . outweighed the possibility that DISH might increase its offer . . . ."[133] The Special Committee also noted that Sprint's lawsuit against DISH "gives rise to greater uncertainty regarding the closing of the DISH Offer."[134]

On June 20, 2013, the Special Committee voted unanimously to recommend Sprint's offer to the Board. The Board adopted the Special Committee's recommendation later that day.[135] Sprint and Clearwire subsequently entered into an amended merger agreement that increased the merger consideration to $5.00 per share.

During a special meeting of stockholders held July 8, 2013, the holders of approximately 82% of Clearwire's unaffiliated shares voted in favor of the Clearwire-Sprint Merger. On July 9, the Clearwire-Sprint Merger closed. On July 10, the Sprint-Softbank Transaction closed.

---

[132] JX 2006 at 2.

[133] JX 2003 at 2.

[134] *Id.*

[135] PTO ¶ 381.

## II.     THE BREACH OF FIDUCIARY DUTY CLAIM

Aurelius sought to prove that the Clearwire-Sprint Merger resulted from breaches of fiduciary duty by Sprint, aided and abetted by Softbank. Aurelius also pursued a statutory appraisal of its shares. The Delaware Supreme Court has instructed that when a litigant asserts both types of claims, the Court of Chancery should address the breach of fiduciary duty claims first, because a finding of liability and the resultant remedy could moot the appraisal proceeding.[136]

## A.     The Standard Of Review

To determine whether a corporate fiduciary has breached its duties, a court examines the fiduciary's conduct through the lens of a standard of review.[137] "When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion."[138]

---

[136] *Cede & Co. v. Technicolor, Inc.* (*Technicolor I*), 542 A.2d 1182, 1188 (Del. 1988).

[137] *Chen v. Howard Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35-36 (Del. Ch. 2013). *See* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001).

[138] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012); *accord Kahn v. M & F Worldwide Corp.* (*MFW II*), 88 A.3d 635, 642 (Del. 2014); *Kahn v. Tremont Corp.* (*Tremont II*), 694 A.2d 422, 428 (Del. 1997).

In an effort to avoid fiduciary review entirely, Sprint argues that it was not a controlling stockholder and therefore did not owe fiduciary duties to Clearwire and its minority stockholders. Sprint owned a majority of Clearwire's equity, which traditionally sufficed to confer controlling stockholder status and concomitant fiduciary duties.[139] Sprint, however, disputes this proposition and asserts that even a majority stockholder must exercise actual or effective control over the corporation's board of directors before it can be deemed a controller and a fiduciary. Building on this premise, Sprint argues that the governance provisions in the Equityholders' Agreement prevented Sprint from exercising effective control over Clearwire and prevented Sprint from owing fiduciary duties. Given the outcome of the case, I need not reach this argument. Assuming that Sprint was Clearwire's controlling stockholder, Sprint did not breach its fiduciary duties.

In an effort to ameliorate the burden it would bear under the entire fairness standard, Sprint argues that either the involvement of the Special Committee or the requirement of a majority-of-the-minority vote resulted in Aurelius bearing the burden at trial to prove that the Clearwire-Sprint Merger was unfair. The Delaware Supreme Court has held that when entire fairness applies, the defendant fiduciaries bear the burden of proving fairness unless

---

[139] *See, e.g.*, *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) ("This Court has held that 'a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.'") (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (Strine, V.C.) ("Under our law, a controlling stockholder exists when a stockholder: 1) owns more than 50% of the voting power of a corporation; or 2) exercises control over the business and affairs of the corporation.").

they seek and obtain a pretrial determination that the burden should be allocated differently.[140] In this case, the defendants moved for summary judgment on this issue, but the record did not permit a pretrial determination that the defendants were entitled to a burden shift.[141] The burden of proof therefore remained with Sprint "throughout the trial to demonstrate the entire fairness of the interested transaction."[142]

In an effort to limit the extent of the conduct that is subject to review under the entire fairness test, Sprint argues that its actions should be evaluated separately and in isolation from Softbank's, such that none of Softbank's activities can attributed to Sprint. Contrary to Sprint's position, there are a range of fact-specific circumstances in which the conduct of one actor can be attributed to another for purposes of imposing liability.[143] This decision does not require detailed analysis on this point because even if all of Softbank's conduct is attributed to Sprint and viewed in the aggregate, Sprint did not breach its fiduciary duties.

## B. Evaluating Fairness

As noted, when a stockholder plaintiff challenges a transaction between a corporation and its controlling stockholder, the governing standard of review is entire

---

[140] *Ams. Mining*, 51 A.3d at 1243.

[141] *See* Dkt. 436.

[142] *Ams. Mining*, 51 A.3d at 1243.

[143] *See generally* Restatement (Second) of Torts § 876(a), cmt. a (Am. Law. Inst. 1979). Delaware courts have relied on Section 876 when analyzing secondary liability for a breach of fiduciary duty. *See Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006); *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 63 (Del. Ch. 2015); *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009) (Strine, V.C.).

fairness. "Fairness does not depend on the parties' subjective beliefs."[144] Once entire fairness applies, the defendants must establish "to the court's satisfaction that the transaction was the product of both fair dealing and fair price."[145]

"The concept of fairness has two basic aspects: fair dealing and fair price."[146] Although the two aspects may be examined in turn, they are not separate elements of a two-part test. "[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[147]

The fair dealing aspect of the unitary entire fairness standard "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[148] As with the overarching issue of fairness, the various dimensions of fair dealing can elide, such that a particular instance of unfair dealing undermines multiple

---

[144] *In re Dole Food Co. S'holder Litig.*, 2015 WL 5052214, at *26 (Del. Ch. Aug. 27, 2015).

[145] *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary IV*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted); *accord Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006) ("Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.").

[146] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[147] *Id.*

[148] *Id.*

aspects of the process. This is often the case when a controller engages in an act of unfair

dealing that it subsequently fails to disclose. In those situations, the act both provides

evidence of unfairness in its own right and gives rise to an additional instance of unfairness

in the form of a disclosure violation.[149]

The fair price aspect of the entire fairness test "relates to the economic and financial

considerations of the proposed merger, including all relevant factors: assets, market value,

earnings, future prospects, and any other elements that affect the intrinsic or inherent value

of a company's stock."[150] The economic inquiry called for by the fair price aspect is the

same as the fair value standard under the appraisal statute.[151] The two standards differ,

---

[149] *See Rabkin v. Phillip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985) ("[The] duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation."); *Weinberger*, 457 A.2d at 710 (holding that the entire fairness standard requires compliance with the duty of disclosure and incorporating this principle into the fair dealing aspect of the test); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding that when a controlling stockholder pursues a squeeze-out merger, the controller owes the same fiduciary duty of disclosure as the directors of the controlled corporation).

[150] *Weinberger*, 457 A.2d at 711.

[151] *Id.* at 713-14 (equating fair price aspect of entire fairness with fair value standard in appraisal); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952) (adopting for entire fairness case the valuation standard for appraisal announced in *Tri–Continental v. Battye*, 74 A.2d 71 (Del. 1950)); *accord Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) (explaining that fair price aspect of entire fairness standard "flow[s] from the statutory provisions . . . designed to ensure fair value by an appraisal, 8 *Del. C.* § 262"); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) (following *Sterling*); *see, e.g.*, *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 342-44 (Del. Ch. 2006) (Strine, V.C.) (determining company's per-share value, then using that value "as the basis for a conclusion that the merger was not financially fair to the squeezed-out minority . . . as a matter of equity," and granting the same amount as damages); *In re Emerging Commc'ns S'holders Litig.*, 2004 WL 1305745, at *24 (Del. Ch. June 4, 2004) (determining

45

however, in that the appraisal statute requires that the court determine a point estimate for fair value measured in dollars and cents.[152] The fair price aspect of the entire fairness test, by contrast, is not in itself a remedial calculation. The entire fairness test is a standard of review that is applied to identify a fiduciary breach.[153] "For purposes of determining

that "fair value" of company was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the Delaware fiduciary duty case law beginning with Weinberger," and granting the difference as damages); *see also* John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L. Rev. 1251, 1261 (1999) ("In entire fairness cases, corporate fiduciaries are required to show that the terms of a proposed conflict transaction include a 'fair price,' and Delaware courts look to appraisal cases for guidance in deciding whether a given price is fair, even when a merger does not trigger appraisal rights."); Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. Rev. 1021, 1030 (2009) ("[I]t is generally accepted in the Delaware case law and the major treatises on Delaware corporate law that in evaluating the entire fairness of a squeeze-out merger, the courts generally utilize the same valuation analysis for both the fair price prong of the fiduciary duty action and the appraisal action.") (internal quotations omitted); Guhan Subramanian, *Fixing Freezeouts*, 115 Yale L.J. 2, 43 (2005) ("As a starting point, courts in entire fairness proceedings generally look to the appraisal remedy. . . ."). *See generally Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 461-64 (Del. Ch. 2011) (discussing authorities).

[152] 8 *Del. C.* § 262(h); *see In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 30 (Del. Ch. 2014).

[153] *See generally In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *25-27 (Del. Ch. May 31, 2016) (appeal pending) (distinguishing between the task of determining fair value in an appraisal and the application of a standard of review for purposes of evaluating a fiduciary breach, albeit with primary emphasis on the intermediate standard of enhanced scrutiny rather than entire fairness). *See generally* Charles Korsmo & Minor Myers, *Reforming Modern Appraisal Litigation*, 41 Del. J. Corp. L. 279, 320-25 (2017) (comparing appraisal with fiduciary review with primary focus on deals without a controlling stockholder); Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U. L. Rev. 1551, 1607-09 (2015) (same).

fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness."[154]

When evaluating the question of fiduciary breach, the court considers whether "a reasonable seller, under all of the circumstances, would regard [the transaction] as within a range of fair value; one that such a seller could reasonably accept."[155] This standard recognizes the reality that "[t]he value of a corporation is not a point on a line, but a range of reasonable values. . . ."[156] Applying this standard, a court could conclude that a price fell within a range of fairness that would not support fiduciary liability, and yet the point calculation demanded by the appraisal statute could yield an award in excess of the merger price.[157]

---

[154] *Dole*, 2015 WL 5052214, at *33.

[155] *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary III*), 663 A.2d 1134, 1143 (Del. Ch. 1994) (Allen, C.), *aff'd*, *Technicolor Plenary IV*, 663 A.2d at 1180; *accord Kahn v. Tremont Corp.* (*Tremont I*), 1996 WL 145452, at *1 (Del. Ch. Mar. 21, 1996) (Allen, C.) ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept."), *aff'd in part, rev'd in part on other grounds*, *Tremont II*, 694 A.2d at 422.

[156] *Cede & Co. v. Technicolor, Inc.* (*Technicolor Appraisal II*), 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del. 2005).

[157] *Orchard Enters.*, 88 A.3d at 30-31. *Compare Technicolor Plenary IV,* 663 A.2d at 1176-77 (affirming that merger consideration of $23 per share was entirely fair), *with Cede & Co. v. Technicolor, Inc.* (*Technicolor Appraisal III*), 884 A.2d 26, 30 (Del. 2005) (awarding fair value in appraisal of $28.41 per share).

Consistent with the unitary nature of the entire fairness test, the fair process and fair price aspects interact. The range of fairness has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections.[158] A strong record of fair dealing can influence the fair price inquiry and lead to a conclusion that the price was fair. But the range of fairness is not a safe-harbor that permits controllers to extract barely fair transactions. Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved. Under those circumstances, the appropriate

---

[158] *See, e.g., M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999) ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value."); *Rosenblatt*, 493 A.2d at 937-38 (observing that controller established separate negotiating terms to recreate arm's-length bargaining, that negotiations were adversarial, and that result was "more than the theoretical concept of what an independent boar might do under the circumstances" and "[i]nstead . . . clear that these contending parties to the merger in fact exerted their bargaining power against one another")); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 6, 1991) ("The most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller . . . was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available. The fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair.").

remedy can be a "fairer" price[159] or an award of rescissory damages.[160] Just as a fair process can support the price, an unfair process can taint the price.[161]

Broadly framed, the deal process in this case had two phases. The first phase encompassed Sprint and Softbank's overtures to Clearwire, the negotiation of the original merger agreement, and Sprint and Softbank's efforts to obtain stockholder approval at the original price of $2.97 per share. When stockholder approval was not achieved and DISH

---

[159] *Reis*, 28 A.3d at 467. *See, e.g.*, *Dole*, 2015 WL 5052214, at *1 (finding that controller and his associate had engaged in fraud; holding that "under these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116-17 (Del. Ch. 1999) (Strine, V.C.) (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Bomarko, Inc. v. Int'l Telecharge Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999) (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts), *aff'd*, 766 A.2d 437 (Del. 2000).

[160] *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023-24 (Del. 2001); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501-03 (Del. 1981), *overruled on other grounds*, *Weinberger*, 457 A.2d at 703-04; *Paradee v. Paradee*, 2010 WL 3959604, at *13-14 (Del. Ch. Oct. 5, 2010).

[161] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under Weinberger's unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Bomarko*, 794 A.2d at 1183 ("[T]he unfairness of the process also infects the fairness of the price.").

intervened, the deal process entered a second phase that resulted in the final merger consideration of $5.00 per share.

Aurelius has identified multiple instances of unfair dealing that took place during the first phase. Aurelius has not identified any meaningful instances of unfair dealing during the second phase. If Sprint and Softbank had succeeded in obtaining stockholder approval of the Clearwire-Sprint Merger at the original price of $2.97 per share, then their acts of unfair dealing would have resulted in a finding of unfairness and a damages award in the form of a fairer price. But DISH's intervention changed the landscape so substantially as to render immaterial the instances of unfair dealing that took place during the first phase. The final merger consideration of $5.00 per share was a price that a seller, under all of the circumstances, could reasonably accept. Approximately 70% of the non-Sprint stockholders, including the Gang of Four and excluding Intel, accepted that price. Despite Sprint and Softbank's unfair dealing during the first phase, the Clearwire-Sprint Merger was entirely fair.

### 1.    Transaction Initiation

"Fair dealing encompasses an evaluation of how the transaction was initiated."[162] "The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal

---

[162] *Trados*, 73 A.3d at 56.

proposal."[163] Aurelius identifies two issues during this period: (i) Sprint and Softbank's obstruction of a business opportunity with Qualcomm and (ii) Sprint's early discussions about price with Stanton.

### a. The Qualcomm Opportunity

Aurelius claims that Sprint dealt unfairly with Clearwire by interfering with a business opportunity to sell spectrum to Qualcomm. Aurelius contends that Sprint sought to weaken Clearwire so that Clearwire would be in a compromised bargaining position when negotiating the merger. Although the parties have not cited a Delaware case that deals with similar conduct, Delaware decisions have recognized that "[a] calculated effort to depress the [market] price" of a stock "until the minority stockholders are eliminated by merger or some other form of acquisition" constitutes unfair dealing.[164] By parity of reasoning, depriving the controlled company of business opportunities in a calculated effort to depress its value also constitutes unfair dealing.

In October 2012, Sprint and Softbank were planning their acquisition of Clearwire but had not yet approached the Company. Hesse and Son learned that Clearwire was exploring a sale of spectrum to Qualcomm that would raise much needed cash. To interfere with that transaction, Hesse and Son called Qualcomm and warned that "Sprint would have

---

[163] *Dole*, 2015 WL 5052214, at *26.

[164] *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987); *accord Dole*, 2015 WL 5052214, at *27.

51

to approve any sale of Clearwire spectrum."[165] Stanton described the call as an effort by Sprint and Softbank to "cut [Clearwire] off from [its] alternatives," and he complained that Hesse and Son's interference "damaged [Clearwire's] credibility with Qualcomm and made it more difficult for us to do a transaction with them."[166] The factual record supports Stanton's assessment.

If the final deal price had remained at $2.97 per share, then the Qualcomm incident would have provided some evidence of unfairness. Sprint and Softbank tried to harm Clearwire by interfering with one of its alternatives, and the additional resources from a successful sale of spectrum could have helped the Special Committee bargain with Sprint. But the causal connection is tangential, and the extent of the effect unclear. Moreover, the incident lost its relevance once Clearwire's stockholders rejected the merger at $2.97 per share, DISH intervened, and Sprint increased the merger consideration to $5.00 per share. At most, the Qualcomm incident might have prevented the Special Committee from obtaining a price marginally greater than $2.97 per share. The price of $5.00 per share that Clearwire's stockholders received was far beyond anything the Special Committee could have extracted without DISH's intervention, even if the Qualcomm incident had not happened.

b.    **The Early Discussions With Stanton**

---

[165] JX 761.

[166] *Id.*

Aurelius also claims that Sprint dealt unfairly with Clearwire by engaging in early discussions with Stanton in an effort to cap what Sprint would have to pay. Aurelius focuses on a meeting on October 8, 2012, when Stanton signaled that the Clearwire Board would support a merger at $2.00 per share, and a meeting on November 2, 2012, when Stanton told Sprint and Softbank that he could "deliver the shareholders" at $2.97 per share. Aurelius observes that these discussions took place without authorization from the Clearwire Board and before the Special Committee was formed.

The record as a whole shows that during this period, Stanton was trying to elicit an offer from Sprint. Stanton was concerned about Clearwire's prospects and believed a merger with Sprint was Clearwire's best alternative. When Stanton discussed a figure of $2.00 per share in October 2012, Clearwire's stock was trading around $1.30 per share. After news of the Sprint-Softbank transaction leaked on October 11, Clearwire's stock jumped to $2.22 per share. During a call after the news leaked, Stanton told Hesse that Sprint should make a "fair offer."[167]

Meanwhile, Eagle River used the unique bargaining leverage it possessed because of its governance rights to extract $2.97 per share. During the meeting on November 2, 2012, Stanton tried to obtain the highest price possible for Clearwire's public stockholders. The public minority lacked the same leverage as Eagle River, but Stanton saw an opportunity to get the same price for the public shares. He therefore told Son that

---

[167] JX 602.

53

Clearwire's stockholders would not support a transaction at less than $2.97 per share. While it is true that Stanton also said that he could "deliver the stockholders" at $2.97 per share, that was puffery and intended to induce Softbank to offer that price. I do not believe that Stanton was committing to support that price, only saying that this was the minimum price that could get a deal done because of the precedent of the Eagle River transaction.

Son heard Stanton as making "a commitment . . . to do [a] deal at $2.97,"[168] but that was a miscommunication. Stanton could not legally bind the Clearwire Board, nor could he deliver votes from stockholders whom he did not control. Son may have misunderstood because of language difficulties (Son speaks fluent English, but it is not his first language) or due to different cultural expectations (as the CEO-controller of a Japanese corporation, Son might have made the type of commitment that he thought Stanton made). Regardless of its source, the miscommunication affected the negotiations. When the Special Committee later sought $3.15 per share, Son flatly refused "as a matter of principle."[169]

As with the Qualcomm incident, if the final deal price had remained at $2.97 per share, then Stanton's early discussions might have provided some evidence of unfairness. Stanton did get out in front of the Clearwire Board, and he did limit the Special Committee's freedom to negotiate. Standing alone, Stanton's communications would not have supported a finding of unfairness, but they would have been part of the overall mix.

[168] Tr. 808:15-19 (Son).

[169] JX 1145.

Under no circumstances would Stanton's communications have resulted in liability for him, because I am convinced that when negotiating, he acted in a good faith effort to pursue the best interests of Clearwire and its stockholders.[170] He may have erred, but not disloyally or in bad faith.

Regardless, Stanton's early communications with Sprint made little difference after Clearwire's stockholders rejected the merger at $2.97 per share and DISH intervened. Competition from DISH drove Sprint to offer $5.00 per share. At most, Stanton's comments might have prevented the Special Committee from obtaining a price marginally greater than $2.97 per share. The price of $5.00 per share that Clearwire's stockholders received was far beyond anything the Special Committee could have extracted without DISH's intervention, even if Stanton had never had his early meetings with Sprint and Softbank.

### 2. Transaction Negotiation

"Fair dealing encompasses questions of how the transaction is negotiated and structured."[171] The record establishes that the Special Committee was independent and bargained at arm's-length. Aurelius attacks the negotiations by arguing that Sprint deprived the Special Committee of material information by failing to disclose its projections for its use of Clearwire's spectrum.

---

[170] Aurelius originally included Stanton as a defendant, but later stipulated to a voluntary dismissal with prejudice of its claims against him. *See* Dkt. 283.

[171] *Trados*, 73 A.3d at 58.

"[A]n important element of an effective special committee is that it be fully informed in making its determination."[172] As Chancellor Allen explained, "in order to make a special committee structure work it is necessary that a controlling shareholder disclose fully all the material facts and circumstances surrounding the transaction."[173] Although the underlying disclosure obligation derives from trust law and the duty of loyalty that a fiduciary owes its beneficiary,[174] modern applications focus on the goal of replicating arm's-length negotiations.[175] Seen in this light, the controller's duty of disclosure stops at the point when forcing disclosure would undermine the potential for arm's-length negotiations to take place. Consequently, "there are some categories of information that while possibly material to the decision must [not be disclosed] in order for a negotiation to occur at all. The clearest example would involve information disclosing the top price that a proposed buyer would be willing or able to pay. . . ."[176] A controller similarly is not

---

[172] *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *10 (Del. Ch. Dec. 21, 2005); *see also Lynch*, 638 A.2d at 1120-21 ("Particular consideration must be given to evidence of whether the special committee was truly independent, fully informed, and had the freedom to negotiate at arm's length.").

[173] *Tremont I*, 1996 WL 145452, at *15 (internal quotations and alterations omitted).

[174] *See id.*

[175] *See MFW II*, 88 A.3d at 644 (encouraging structures that replicate "the shareholder-protective characteristics of third-party, arm's-length mergers"); *Weinberger*, 457 A.2d at 709 n.7 (encouraging the use of an independent negotiating committee to replicate arm's-length bargaining).

[176] *Tremont I*, 1996 WL 145452, at *15; *see Rosenblatt*, 493 A.2d at 939 ("While it has been suggested that *Weinberger* stands for the proposition that a majority shareholder must under all circumstances disclose its top bid to the minority, that clearly is a misconception of what we said there."); *In re Pure Resources S'holder Litig.*, 808 A.2d

required to disclose private information that reveals how a controller values the company and hence what the controller is willing to pay.[177]

When the negotiations between Sprint and the Special Committee were taking place, Sprint possessed two set of internal projections. Both forecasted greater demand for Clearwire's spectrum than Clearwire's internal projections. Sprint did not provide its projections to the Special Committee, which only had the Single Customer Case and the Multi Customer Case.

Aurelius claims that Sprint had to disclose its projections to the Special Committee, but that is incorrect. The projections constituted private information that would have revealed how Sprint valued Clearwire and hence how much Sprint was willing to pay. Because Sprint was Clearwire's only significant customer, Clearwire's value largely depended on how much demand Sprint had for Clearwire's spectrum. Armed with Sprint's

---

421, 451 (Del. Ch. 2002) (Strine, V.C.) (forcing a controller to disclose its reserve price renders "the possibility of a price negotiation in negotiated mergers involving a controlling stockholder . . . a practical impossibility.").

[177] *See, e.g.*, *Rosenblatt*, 493 A.2d at 939 (holding that a controller was not required to disclose a financial projection prepared by its own financial officer); *Tremont I*, 1996 WL 145452, at *17 (holding that a controlling stockholder was not required to disclose advice from its banker about possible illiquidity discounts for the assets exchanged and concluding that "requir[ing] the disclosure of such information in this context would be to take a large step toward abandonment of the special committee structure as a useful technique to try to deal with the potentials and the risks of self-dealing transactions"); *Liang v. Cohen*, C.A. No. 5721-VCL, Tr. at 43-44 (Del. Ch. Aug. 19, 2010) (TRANSCRIPT) ("[W]hile certainly there's an obligation . . . to disclose pricing information that you got from the company, the idea that [a controller] would have to explain all of its internal pricing dynamics doesn't make sense to me.").

projections, the Special Committee could have run a discounted cash flow analysis to determine Sprint's reserve price. Consequently, Sprint did not have a duty to disclose them. Notably, the Special Committee and its advisors did not expect to receive Sprint's long-term projections and did not ask for them.[178] Under the circumstances, Sprint had no duty to give Clearwire its projections, and its failure to provide them is not evidence of unfair dealing.

### 3. Stockholder Approval

Fair dealing encompasses questions of "how the approvals of . . . the stockholders were obtained."[179] Aurelius has identified multiple instances of unfair dealing by Sprint and Softbank in connection with the vote on the Clearwire-Sprint Merger at the original price of $2.97 per share. Their activities were sufficiently extensive, intentional, and manipulative that if the stockholders had approved the merger at the original price of $2.97 per share, the vote could not have been given any legitimacy. But the problem for Aurelius is that despite Sprint and Softbank's machinations, the stockholders refused to approve the merger at $2.97 per share. DISH then intervened and started a bidding war. The competition from DISH resulted in a price beyond anything the Special Committee or the stockholders could have achieved on their own, even without Sprint and Softbank's interventions.

---

[178] *See* Tr. 1511:17-23 (Stanton); JX 2195, Saw Dep. 115:9-16.

[179] *Trados*, 73 A.3d at 58 (quoting *Weinberger*, 457 A.2d at 711).

### a. Stockholder Approval at $2.97 Per Share

Aurelius proved that Sprint and Softbank jointly engaged in multiple acts of unfair dealing in an effort to obtain stockholder approval for the Clearwire-Sprint Merger at $2.97 per share. This decision could spend many pages discussing the nuances of each and their legal implications, but because they did not ultimately undermine the fairness of the merger, that discussion would be gratuitous. In brief, the incidents were as follows:

- **SoftBank bought Intel's vote in support of the Clearwire-Sprint Merger.** The record establishes that Son secured Intel's support for the merger by promising Intel a broader commercial relationship, including a partnership on a new cellular handset.[180] Intel's CEO wrote bluntly that Intel "agreed to sell [its Clearwire] shares contingent on a broader business deal."[181] Vote buying ordinarily is analyzed as an independent wrong.[182] In this instance, it was part of Sprint and Softbank's unfair dealing.

---

[180] JX 827 at 2; *see also* JX 831 (noting that Otellini "suggested at one point that his cooperation was tied to [Softbank] doing business with them"); JX 845 (Son committing to launch an Intel-based phone in three major countries late in 2013 if Intel provided a phone with the necessary specifications as part of "following through with [the] commitment I made to [Otellini]").

[181] JX 1186 at 2; *accord* JX 1201 (same). After Otellini's candid confirmation, Sodhani and Intel's counsel sought to sanitize the written record. *See* JX 1186 at 1. Other statements confirm that an agreement was in place. *See id.* at 2 ("[I]f it weren't for the piss off factor with Softbank I would [refuse to commit to supporting the Clearwire-Sprint Merger] and play hardball."); JX 857 (email informing Softbank that Intel was "prepared to move forward" with supporting the Clearwire-Sprint Merger and looked forward to working on future "strategic opportunities"); JX 867 at 1 (Intel telling Softbank that "to show their support for this new relationship, Intel would like to invest any proceeds from the [Clearwire-Sprint Merger] in Softbank stock.").

[182] *See generally Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 388-390 (Del. 2010) (discussing principles governing third-party vote buying); *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 66-71 (Del. Ch. 2008) (Strine, V.C.) (discussing principles governing vote buying by fiduciaries and those acting in concert with them); *Hewlett v. Hewlett-Packard Co.*, 2002 WL 549137, at *5-7 (Del. Ch. Apr. 8, 2002) (same).

- **Sprint and Softbank failed to disclose the side deal with Intel**. The proxy statement omitted any mention of Softbank's commitment to Intel. Instead, Sprint stressed Intel's support for the Clearwire-Sprint Merger as evidence that "Sprint's $2.97 per share offer provides full value to Clearwire's stockholders."[183] This disclosure implied that Intel supported the merger solely because Intel believed that the price was fair, rather than because Intel also thought it was getting a broader commercial relationship. The proxy statement should have contained a complete description of Intel's reasons for supporting the merger.[184]

- **Sprint and Softbank blocked another potential spectrum sale**. In a reprise of the Qualcomm incident, Sprint and Softbank shut down inquiries from Google that could have developed into an opportunity for Clearwire to raise money by selling spectrum.[185] Google initially reached out to Sprint in December 2012, and Sprint convinced Google to wait until after Sprint and Softbank acquired Clearwire.[186] After Sprint and Clearwire signed their merger agreement, Google then reached out to Softbank's financial advisor in January 2013. Softbank did not want a deal with Google announced in advance of the stockholder vote, so Softbank's financial advisor tried to put Google off.[187] Eventually, Google stated that without a response, it would reach out directly to Son, Sprint, or Clearwire.[188] The next day, Fisher told Son that he needed to meet with

---

[183] JX 1686 at 6; *see also* JX 1632 at 58 (Sprint pointing to Intel's support for the merger as evidence that "the Merger is substantially and procedurally fair to [Clearwire's] minority stockholders.").

[184] *Compare Portnoy*, 940 A.2d at 68 (declining to hold that the inclusion of a large stockholder on management's slate constituted consideration in return for the stockholder's vote, in part because "that inference was . . . unmistakable to any rational stockholder" and the electorate would have its "own opportunity to decide for itself whether [the nominee] should serve"), *with id.* at 72-73 (distinguishing separate agreement to expand the board to add a director designated by the large stockholder that was not disclosed to stockholders and therefore not "subject to the important fairness check of the stockholder vote;" holding that the failure to disclose the agreement warranted invalidating the stockholder vote).

[185] *See* JX 1498; JX1502.

[186] JX 1050 at 1.

[187] JX 1502 at 1.

[188] JX 1498 at 1.

Google "to avoid them going directly to Clearwire."[189] A meeting was arranged. Google never approached Clearwire. No one informed Clearwire about Google's interest.[190]

- **Sprint and Softbank allowed the proxy statement to contain an incorrect disclosure about potential spectrum sales.** The interference with Google's interest in purchasing spectrum resulted in a disclosure violation. Although Softbank and Sprint knew about the Google contact, they failed to make the Clearwire directors aware of it. As a result, Clearwire disclosed in the proxy statement that "management of Clearwire and [Stanton] solicited what they believed to be all reasonably available potential buyers of spectrum assets of Clearwire, and . . . each potential buyer that was solicited affirmatively declined any interest in acquiring spectrum, except . . . DISH."[191] This was incorrect. Google was one of the buyers that Clearwire solicited. Google had interest in Clearwire's spectrum, but Sprint and Softbank had convinced Google to wait until after the Clearwire-Sprint Merger closed.[192] Sprint and Softbank knew that this statement was not true and should have informed the Special Committee or clarified the statement in their own communications to Clearwire's stockholders.[193]

- **Sprint and Softbank refused to document the Accelerated Build.** Before the merger agreement was signed, Sprint and Softbank told Stanton that they wanted Clearwire to build 12,500 new sites by the end of 2013, that Sprint would pay for those sites, and that Sprint would make revenue commitments "to cover the continuing costs of long term operation of those sites in the event the [Clearwire-Sprint Merger] did not close,

---

[189] JX 1502 at 1.

[190] *See* JX 1050 at 1; *see also* Tr. 135:15-142:18 (Schell) (testifying he was unaware of Google's communications with Sprint and Softbank); Tr. 266:6-267:13 (Hersch) (same); Tr. 1661:23-1666:13 (Stanton) (same).

[191] JX 1632 at 52.

[192] *See* Tr. 141:21-142:18 (Schell) (acknowledging he would have amended statement in the proxy had he known about Google's contacts with Sprint and Softbank); Tr: 1665:21-1666:8 (Stanton) ("[I]f we had known more [about Google], we would have disclosed more . . . .").

[193] *Bomarko*, 794 A.2d at 1180 (explaining that a fiduciary "may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations"); *see also HMG/Courtland Props.*, 749 A.2d at 119 (explaining that directors have an "unremitting obligation to deal candidly with their fellow directors") (internal quotation marks omitted).

for any reason."[194] Once the merger agreement was executed, Stanton sought to pin down the details in a commercial agreement. He did not believe that Sprint could pay for the Accelerated Build itself, and he was concerned about the possibility that Sprint and Softbank might renege if the Softbank Transaction did not close.[195] Fisher vetoed the idea, telling Softbank's chief technology officer, "Softbank can not have a direct agreement with Clearwire before the Clearwire shareholder vote takes place – this could encourage dissident shareholders to vote against the acquisition because it could make Clearwire look stronger as an independent company."[196] On February 14, 2013, Sprint and Softbank ended discussions on the Accelerated Build. Hesse told Stanton that Son had been "persuaded that he needn't rush to provide coverage . . . and that a more deliberate approach will produce better long-term results."[197] Stanton told Fisher that Sprint and Softbank were acting in "bad faith" and were "not living up to their agreement."[198]

- **Softbank and Sprint made retributive threats.** Sprint repeatedly told Clearwire's minority stockholders that if the Clearwire-Sprint Merger failed, Sprint would take full control of the Clearwire Board, finance Clearwire in a manner that would result in "substantial dilution"[199] to Clearwire's existing stockholders, and engage in a squeeze-out merger without a stockholder vote after the standstill provision of the Equityholders' Agreement expired in November 2013.[200] During the roadshow for the Sprint-Softbank Transaction, Son made similar threats.[201]

- **Sprint insisted on a dilutive conversion price in the Note Purchase Agreement.** When Clearwire sought interim financing in the form of convertible debt, Sprint insisted on a conversion price of $1.50 per share. The low conversion price threated

---

[194] JX 1033 at 1.

[195] *See* JX 1371.

[196] JX 1322. Son was copied on Fisher's e-mail and chimed in for emphasis, "This is important." JX 1324 at 3.

[197] JX 1483 at 3.

[198] *Id.* at 2.

[199] JX 1686 at 5, 16, 17.

[200] *See* JX 1689; JX 1801.

[201] JX 1695 at 3.

stockholders with dilution and had a coercive effect.[202] Clearwire's CFO summarized the situation by stating that "Sprint designed the [Note Purchase Agreement] this way so that it is dilutive in the event that the deal does not close to incent common to vote for the deal."[203]

If Clearwire's stockholders had approved the original merger at $2.97 per share, then this array of misconduct would have resulted in a finding of unfair dealing and a damages award in the form of a fairer price. Sprint and Softbank's misconduct proved ineffective, however, because enough of Clearwire's stockholders opposed the merger at $2.97 per share to prevent Sprint from obtaining a favorable vote.

After DISH intervened and the merger consideration was raised to $5.00 per share, the relevance, materiality, and effectiveness of Sprint and Softbank's misconduct faded.

- **Intel's vote had no effect on the outcome.** Excluding Intel, approximately 70% of Clearwire's minority stockholders approved the merger at $5.00 per share. The effect of the vote-buying also was mitigated, because Intel's reasons for favoring a vote at $2.97 per share had less pertinence once the consideration reached $5.00 per share.

- **A potential Google transaction could not have led to value approaching $5.00 per share.** If the stockholders had known about Google's interest, it would have reinforced their willingness to turn down the merger, but they proved willing to do that regardless. If the Special Committee had known about Google's interest, it might have enabled them to bargain for a transaction above $2.97 per share, but it could not have led to the realization of value exceeding the final merger consideration of $5.00 per share. Indeed, it is not even clear that Google would have engaged in a transaction with Clearwire at all. When Clearwire independently

---

[202] *See In re Gen'l Motors Class H S'holders Litig.*, 734 A.2d 611, 621 (Del. Ch. Mar. 22, 1999) (Strine, V.C.) (explaining that a transaction is structurally coercive if stockholders do not have "the freedom to choose between the status quo and the deal consideration").

[203] JX 930.

contacted Google in December 2012, Google declined to explore a transaction with Clearwire because Google saw Sprint and Softbank as better strategic partners.[204]

- **The Accelerated Build could not have led to value approaching $5.00 per share.** There is no credible basis to think that the value of Clearwire with the Accelerated Build would have exceeded $5.00 per share. Indeed, the value of Clearwire with the Accelerated Build remains highly speculative, because there were major deal points that remained open when Softbank and Sprint postponed the discussions indefinitely. Additionally, Clearwire's definitive proxy statement disclosed Sprint and Softbank's proposal of the Accelerated Build during negotiations and the parties subsequent efforts to reach an agreement.[205] That Clearwire's stockholders nonetheless approved the merger at $5.00 per share suggests that Sprint's offer captured the value from the proposed Accelerated Build.

- **Sprint and Softbank's coercion proved ineffective.** Both the dilutive structure of the Note Purchase Agreement and Sprint and Softbank's retributive threats were attempts at coercion. It is possible that they had some continuing effect after DISH intervened and influenced Clearwire's minority stockholders to approve the merger at the final price of $5.00 per share, but it seems unlikely. If anything, Sprint and Softbank's heavy-handed tactics appear to have had the opposite effect of galvanizing stockholder opposition. In my view, once the price reached $5.00 per share, it was sufficiently generous that the fair price aspect of the entire fairness inquiry predominates over any lingering coercion.[206]

---

[204] *See* JX 1268 at 1 (Google employee telling Sprint employee that Google "chose to not try and get in the middle of your conversations [with Clearwire], as you are a good partner to Google."); JX 1050 at 1 (Google thought that Sprint was "in the best position to potentially do something beneficial with them.").

[205] *See* JX 1632 at 37 ("In th[e] meeting [on December 3, 2012], Mr. Hesse for the first time indicated that Sprint and Softbank wanted Clearwire to substantially accelerated construction of its LTE network."); *id.* at 38 ("From December 4 to December 6, 2012, the Company's engineers met with their respective counterparts at Sprint for technical diligence and to discuss the Company's ability to accelerate its planned LTE deployment."); *id.* at 48 (updating stockholders on February 1, 2013 that "the parties have not come to an agreement on the accelerated build out . . ."); *id.* at 38 (updating stockholders on February 27, 2013 that "Clearwire does not expect to enter into an accelerated build-out agreement with Sprint at this time.").

[206] Aurelius also argues that the threatened dilution under the Note Purchase Agreement amounts to an independent breach of Sprint's fiduciary duties. Aurelius argues that it has standing to assert a direct claim for dilution under *Gentile v. Rossette*, 906 A.2d

In a hypothetical world in which the Clearwire-Sprint Merger closed at $2.97 per share, Sprint and Softbank's interference with the stockholder vote on the Clearwire-Sprint Merger would have warranted a finding of unfairness and an award of a fairer price. Under those circumstances, the resulting award would not have approached $5.00 per share. It likely would have anchored off of the Special Committee's consistent demand of $3.15 per share, thereby giving credit to the contemporaneous judgment of Clearwire's informed, independent fiduciaries. The award also likely would have attempted to remedy in some way the dilution from the Note Purchase Agreement by adjusting the conversion price. At $5.00 per share, the consideration received by the minority stockholders exceeded anything this court would have awarded as a remedy for unfair dealing.

### b.      Stockholder Approval at $5.00 Per Share

Stockholder approval of the transaction eventually took place in July of 2013, after DISH's tender offer. Aurelius complains that Sprint required Clearwire to "terminate all discussions with [DISH]" as a condition for increasing its offer to $5.00 per share.[207]

---

91 (Del. 2006). Whether *Gentile* is still good law is debatable. *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265-66 (Del. 2016) (Strine, C.J., concurring). But even by *Gentile's* terms, direct standing to assert a dilution claim arises only where the corporation "causes the corporation *to issue* 'excessive' shares of its stock." *Id.* at 95 (emphasis added). Because the Clearwire-Sprint Merger closed, Sprint's notes were never converted and no additional shares were issued. Aurelius thus does not have standing to assert a direct dilution claim.

[207] JX 2006 at 2.

Aurelius claims that this demand cut short a potential bidding war between DISH and Sprint that might have yielded a higher price for Clearwire.

Sprint and Softbank did not force the Special Committee to agree to terminate discussions with DISH. The Special Committee concluded that "the benefits of locking in the $5.00 per share proposal from Sprint . . . outweighed the possibility that DISH might increase its offer."[208] Their decision was entirely fair. When DISH raised its price, it demanded the right to appoint directors and veto transactions between Clearwire and Sprint. Sprint immediately sued DISH and Clearwire over those demands. The Special Committee believed that any rights it might try to grant would be unenforceable. Chief Justice Strine, who presided over Sprint's lawsuit while serving as a Chancellor, validated the Special Committee's belief. When hearing Sprint's motion to expedite, then-Chancellor Strine commented that Sprint's claims against DISH and Clearwire had "vibrant, vibrant color."[209] Although DISH had agreed to bear the costs of litigation, the Special Committee was concerned that accepting DISH's tender offer "would result in years of litigation" for Clearwire.[210]

The Special Committee's decision to accept Sprint's offer also did not preclude DISH from topping Sprint's bid unilaterally, as it had done twice before. Contrary to

---

[208] JX 2003 at 2.

[209] JX 2041 at 8.

[210] Tr. 98:3-12 (Schell).

66

Aurelius's claim, the bidding could have continued. That DISH chose not to bid further suggests that it was not willing to top Sprint's offer of $5.00 per share. The Special Committee's decision to accept $5.00 per share and not go back to DISH is not evidence of unfair dealing.

### 4.    The Fairness Of The Price

The fair price aspect can be "the predominant consideration in the unitary entire fairness inquiry."[211] There is ample evidence indicating that that the original deal price of $2.97 per share was fair to Clearwire and its minority stockholders. There is overwhelming evidence that the final deal price of $5.00 per share was fair to Clearwire and its minority stockholders.

Many factors support the fairness of the original deal price of $2.97 per share. It was the product of arm's-length bargaining by Stanton and the Special Committee.[212] Aurelius has not been challenged their independence, and "the record indicates that [they] took their responsibilities seriously."[213]

---

[211] *Dole*, 2015 WL 5052214, at *34.

[212] *See Ams. Mining*, 51 A.3d at 1243-44 (noting that entire fairness review "will be significantly influenced by the work product of a properly functioning special committee of independent directors"); *M.P.M. Enters.*, 731 A.2d at 797 ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value."); *Reis*, 28 A.3d at 467 ("The range of fairness concept has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections.").

[213] *In re Cysive, Inc. S'holders Litig*, 836 A.2d 531, 554 (Del. Ch. 2003) (Strine, V.C.). Aurelius originally included the members of the Special Committee as defendants,

That major Clearwire stockholders agreed to sell their stock at $2.97 per share also supports the fairness of the price.[214] After the announcement of the Sprint-Softbank Transaction, Eagle River sold its Clearwire stock to Sprint for $2.97 per share. Under the Equityholders' Agreement, the other Strategic Investors had a right to purchase Eagle River's shares at that price. None did. The Strategic Investors subsequently agreed to support the Clearwire-Sprint Merger at the same price of $2.97 per share and committed to sell their shares to Sprint at that price if Clearwire's stockholders did not approve the merger. All of the Strategic Investors were sophisticated parties with deep knowledge of Clearwire's business and the wireless industry. Other than Intel, all of the Strategic Investors agreed to sell at $2.97 per share solely because they believed that price was a good one.

Market indications also supports the fairness of the $2.97 per share price. In December 2012, after news leaked about the Sprint-Softbank Transaction but before any media reports of Clearwire and Sprint's negotiations, Clearwire's stock traded at around $2.40 per share.[215] In December 2012, the majority of outside analysts had set target prices

---

but later stipulated to a voluntary dismissal with prejudice of its claims against them. *See* Dkt. 283.

[214] *See Technicolor Plenary III*, 663 A.2d at 1143 ("Th[e] fact that major shareholders . . . . sold their stock to MAF at the same price paid to the remaining shareholders also powerfully implies that the price received was fair.").

[215] PTO ¶ 250.

for Clearwire at or below $3.00 per share.[216] Sprint's bid implicitly valued Clearwire's spectrum at $.21 per MHz-pop,[217] a figure which is consistent with offers for spectrum from DISH and other parties during this period.[218]

There is also the evidence from the experts' opinions at trial. As discussed in the next section, this decision finds persuasive Professor Bradford Cornell's valuation of Clearwire, which determined that Clearwire had a fair value of $2.13 per share. The initial merger consideration of $2.97 per share is fair when judged against this price and is consistent with the Special Committee having successfully extracted a portion of the synergies that Sprint hoped to achieve.

All of the evidence indicating that $2.97 per share was fair is all the more convincing for the final merger consideration of $5.00 per share. Stanton and the Committee never contemplated, much less proposed, anything close to $5.00 per share.[219] In December 2012,

---

[216] JX 1452 at 152.

[217] JX 1662 at 30-31.

[218] *See, e.g.*, JX 1532 at 15-20 (DISH offer in December 2012—implied value of $.22 per MHz-pop before deduction of lease obligations); JX 1587 at 2 (Verizon's offer in April 2013—implied value of $.22-30 per MHz-pop for only valuable urban spectrum and before the deduction of lease obligations); Tr. 25:17-26:9 (Schell) ("[W]e contacted every party in the United States and several parties outside of the United States with regard to the sale of our spectrum. The . . . indicative offers that we received . . . were in the high teens or low 20s."); Tr. 1495:16-1496:4 (Stanton) ("[T]he best indications of interest were in the mid-20s, and that was for pieces of spectrum, but not all the spectrum.").

[219] *See* Tr. 249:1-7 (Hersch) ("$5 exceeded . . . wildly what we thought, when we set out on this journey, [that] we could accomplish."); Tr. 1578:21-24 (Stanton) ($5 per share was "terrific" and "was a great outcome for our shareholders").

most market analysts valued Clearwire at far less than $5.00 per share.[220] In May 2013, large Clearwire stockholders told Sprint and Softbank that they believed that "Clearwire was worth $4-5."[221]

There is also no evidence that anyone at Sprint or Softbank believed that Clearwire was worth $5.00 per share.[222] Rather, they agreed to pay that price because of the massive synergies from the transaction and the threat that DISH posed as a hostile minority investor.[223] Even with these considerations in mind, Softbank only agreed to pay $5.00 per share with great reluctance, and Son adamantly refused to pay any more.[224]

---

[220] *See* JX 1452 at 152.

[221] JX 1772.

[222] *See* JX 1981 at 19 (presentation to Sprint's board noting that, despite $5.00 offer, "there has been no change to the intrinsic value of Clearwire. We remain convinced that the original price of $2.97 was full and fair."); JX 2037 (Sprint executive: "I'd [sic] would never have imagined $5 per share though when it all started. $2.97 still seems like a fair price.").

[223] *See* JX 1981 at 19 (presentation to Sprint's board noting that "there had been no change to the intrinsic value of Clearwire" but "a successful DISH tender could create substantial 'hold-up' value"); JX 2012 (Fisher to Son, "[$5.00 per share] is higher than what I would have liked but we eventually agreed to settle on this as a price that neither of us are happy with, but gets the deal done."); *see also* Tr. 752:6-753:13 (Son) ($5.00 price was "headache medicine" to avoid DISH as a hostile minority investor); Tr. 534:4-20 (Schwartz) (explaining that DISH's tender "put[] a great risk on our ability to either enter into a commercial agreement or acquire the rest of Clearwire [in the future]").

[224] *See* JX 2012 (Fisher telling Son that $5.00 per share was "a higher price than what I would have liked but [he and the Gang of Four] eventually agreed to settle on this as a price that neither of us are happy with, but gets the deal done"); Tr. 754:6-11 (Son) (testifying that he would "absolutely not" have approved any price above $5 per share); Tr. 536:5-10 (Schwartz) ("Softbank went out of its way to be exceedingly clear that there was absolutely no chance that they would pay more than $5."); Tr. 935:23-936:5 (Fisher)

The $5.00 per share also carries the imprimatur of Clearwire's minority stockholders.[225] Excluding Intel's votes, approximately 70% of Clearwire's minority stockholders approved the Clearwire-Sprint Merger. This included the Gang of Four, some of Clearwire's most vocal dissident stockholders. Particularly considering their contentious opposition to the merger at lower prices, approval of the merger at $5.00 per share by a supermajority of Clearwire's minority stockholders is compelling evidence that the price was fair.

### 5. The Unitary Determination Of Fairness

The unitary entire fairness standard requires a singular determination of fairness. "This judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case."[226] "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective."[227]

---

("[W]e felt that $5 was absolutely the maximum and Mr. Son had strongly pushed me to try to find a resolution below that price.").

[225] *See Ams. Mining*, 51 A.2d at 1244 (noting that in an entire fairness analysis, "the issue of how stockholder approval was obtained will be significantly influenced by the affirmative vote of a majority of the minority stockholders); *see also Gesoff*, 902 A.2d at 1148 ("[T]his court has suggested repeatedly that the presence of a non-waivable 'majority of the minority' provision is an indicator at trial of fairness because it disables the power of the majority stockholder to both initiate and approve the merger."); *Cysive*, 836 A.2d at 550 (noting that "a fully-informed majority of the minority vote" is "powerful evidence of fairness").

[226] *Technicolor Plenary III*, 663 A.2d at 1140.

[227] *Tremont I*, 1996 WL 145452, at *15.

In my view, the Clearwire-Sprint Merger was entirely fair to Clearwire's minority stockholders. Sprint and Softbank engaged in unfair dealing early in the process and when seeking to achieve stockholder approval at $2.97 per share. The stockholders' refusal to take that price, and DISH's intervention in the sale process, freshened the atmosphere and created a competitive dynamic. The resulting competition between DISH and Sprint led to the $5.00 per share merger consideration, independent of the earlier acts of unfair dealing by Sprint and Softbank.

"[P]erfection is not possible, or expected as a condition precedent to a judicial determination of entire fairness."[228] The Delaware Supreme Court has characterized the proper "test of fairness" as whether "the minority stockholder shall receive the substantial equivalent in value of what he had before."[229] Through the Clearwire-Sprint Merger, Clearwire's stockholders received substantially more in value than what they had before. The outcome had blemishes, even flaws, but it was entirely fair.

## C. Aiding and Abetting Claim Against Softbank

Aurelius alleges that Softbank aided and abetted Sprint's breach of fiduciary duty. A claim for aiding and abetting requires an underlying breach of fiduciary duty.[230] Because

---

[228] *Technicolor Plenary IV*, 663 A.2d at 1179 (internal quotation marks omitted); *accord Weinberger*, 457 A.2d at 709 n.7 ("[P]erfection is not possible, or expected . . . ."); *Brinckerhoff v. Texas E. Prod. Pipeline Co., LLC*, 986 A.2d 370, 395 (Del. Ch. 2010) ("Perfection is an unattainable standard that Delaware law does not require, even in a transaction with a controller.").

[229] *Sterling*, 93 A.2d at 114; *accord Rosenblatt*, 493 A.2d at 940.

[230] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

the Clearwire-Sprint Merger satisfied the test of entire fairness, Sprint did not breach its fiduciary duties to Clearwire or its minority stockholders. Softbank therefore cannot be liable for aiding and abetting.

### III.     THE APPRAISAL CLAIM

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings."[231] Delaware's appraisal statute requires that the court "determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation . . . ."[232] When determining fair value, the statute instructs the court to "take into account all relevant factors."[233] "In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own."[234] It is "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record."[235]

---

[231] *Technicolor I*, 542 A.2d at 1186.

[232] 8 *Del. C.* 262(h).

[233] *Id.*

[234] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999).

[235] *Id.* at 526.

73

"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern."[236] When applying this standard, the corporation "must be valued as a going concern based upon the operative reality of the company as of the time of the merger," taking into account its particular market position in light of future prospects.[237] A determination of fair value assesses "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition."[238] Consequently, the "appraisal statute requires that the Court exclude any synergies present in the deal price—that is, value arising solely from the deal."[239]

## A.      The Merger Price

The consideration that the buyer agrees to provide in the deal and that the seller agrees to accept is one form of market price data, which Delaware courts have long

---

[236] *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950). Subsequent Delaware Supreme Court decisions have adhered consistently to *Battye's* definition of value. *See, e.g.*, *Montgomery Cellular Hldg. Co., Inc. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp. v. Hartnett*, 564 A.2d 1137, 1144 (Del. 1989); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975).

[237] *M.G. Bancorporation*, 737 A.2d at 525 (internal quotations omitted).

[238] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999).

[239] *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *14 (Del. Ch. Oct. 21, 2015).

considered in appraisal proceedings.[240] Unlike in many cases, the respondent has not argued that the court should give weight to the deal price. This is unsurprising, because the Clearwire-Sprint Merger involved a controlling stockholder.[241] Although the merger ultimately satisfied entire fairness, the deal process was far from perfect.

The deal price also provided an exaggerated picture of Clearwire's value because the transaction generated considerable synergies. In June 2013, Sprint estimated that the merger yielded synergies ranging from $1.5 to $2 billion, or $1.95 to 2.60 per share.[242]

---

[240] *See generally* Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations*, 38–5th C.P.S. §§ IV(H)(3), at A-57 to A-59 (BNA).

[241] *See, e.g.*, *Dunmire v. Farmer & Merchants Bancorp of W. Pa., Inc.*, 2016 WL 6651411, at *7 (Del. Ch. Nov. 10, 2016) (declining to rely on deal price where "the Merger was not the product of an auction," a controlling stockholder stood on both sides of a transaction, and the special committee's performance did "not inspire confidence that the negotiations were truly arms-length"); *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 511 (Del. Ch. 2010) (Strine, V.C.) (finding the deal price to have "no reliable bearing on [the court's] appraisal valuation" because "the Special Committee treated the context as one closer to a merger proposal by a controlling stockholder"), *aff'd* 11 A.3d 214 (Del. 2010). *Compare Union Ill. 1995 Inv. Ltd. P'Ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 350 (Del. Ch. 2004) (Strine, V.C) (finding the deal price reliable evidence of fair value where the merger was "not a situation involving a squeeze-out merger" but "an effective process whereby third party bidders were invited to buy [the company] after receiving confidential data about the company's prospects.").

[242] JX 1981 at 20.

Other synergy estimates were higher still.[243] If the court relied on Clearwire's deal price, it would have to determine the value of those synergies and back them out.[244]

Because no one argued in favor of the deal price, and because the record contains other reliable evidence of fair value, this decision does not consider the deal price.

**B.     Discounted Cash Flow Analysis**

A discounted cash flow ("DCF") analysis is an established method of determining the going concern value of a corporation.[245] Both Sprint and Aurelius relied on DCF analyses to determine Clearwire's fair value. The petitioners' expert, Professor Gregg Jarrell, found that Clearwire had a fair value of $16.08 per share. The respondent's expert, Professor Bradford Cornell, found that Clearwire had a fair value of $2.13 per share.

**1.     The Projections**

"The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management

---

[243] *See, e.g.*, JX 447 at 20 (Softbank's banker estimating synergies between $3 to $5 billion); JX 807 at 13 (Clearwire estimating over $3 billion in synergies); JX 1014 at 16 (Centerview estimating "up to $1.2 billion in annual operating savings, and more than $1.6 billion in aggregate near-term CapEx savings").

[244] *See, e.g.*, *BMC Software*, 2015 WL 6164771, at *16; *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 61 (Del. Ch. Aug. 17, 2007); *Union Ill.*, 847 A.2d at 364.

[245] *See Owen v. Cannon*, 2015 WL 3819204, at *16 (Del. Ch. June 17, 2015) ("[T]he DCF . . . methodology has featured prominently in this Court because it is the approach that merits the greatest confidence within the financial community.") (internal quotations omitted).

76

projections prepared in the ordinary course of business."[246] "Delaware law clearly prefers

valuations based on contemporaneously prepared management projections because

management ordinarily has the best first-hand knowledge of the company's operations."[247]

"When management projections are made in the ordinary course of business, they are

generally deemed reliable."[248] This court has rejected projections that were not prepared in

the ordinary course of business and which showed the influence of the transactional

dynamics in which they were created.[249]

In this case, the experts' choice of projections drove 90% of the difference in their

DCF valuations.[250] Jarrell used the Full Build Projections. Cornell used the Single

Customer Case. For the reasons explained below, the Full Build Projections did not reflect

---

[246] *In re Petsmart, Inc.*, 2017 WL 2303599, at *32 (Del. Ch. May 26, 2017).

[247] *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, *revised* June 10, 2004).

[248] *Technicolor Appraisal II*, 2003 WL 23700218, at *7

[249] *See Petsmart*, 2017 WL 2303599, at *34 (rejecting projections that were "prepared not in the ordinary course but to facilitate a sale of the Company"); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *9-10 (Del. Ch. Nov. 1, 2013) (rejecting projections made in anticipation of negotiations with buyers to generate a higher merger price); *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *4 (Del. Ch. Apr. 30, 2012) (rejecting projections "made at a time when [two of the corporation's officers] risked losing their positions if the GEO bid succeeded and were involved in trying to convince the Board to pursue a difference strategic alternative in which [those two officers] were involved").

[250] Tr. 1434:4-7 (Cornell). *Compare* JX 2222 at 56 (Cornell calculating Clearwire's fair value at $.79 per share using the Single Customer Case and excluding value attributable to excess spectrum), with JX 2224 at 136 (Jarrell calculating Clearwire's fair value at $1.14 per share using the Single Customer Case and excluding value attributable to excess spectrum).

Clearwire's operative reality in the event that the Clearwire-Sprint Merger did not close. The Single Customer Case, prepared by Clearwire's management in the ordinary course of business, reflected Clearwire's operative reality on the date of the merger.

### a. The Full Build Projections

The Full Build Projections were created by Sprint's management team, not Clearwire's. The Full Build Projections also were not created in the ordinary course of business. Sprint management created them to convince Softbank to top DISH's tender offer by showing what it would look like to attempt the same business plan without owning Clearwire. To build the projections, Sprint's corporate development team took models premised on an acquisition of Clearwire, then posited that Sprint would make all the same business decisions if it had pay wholesale prices to Clearwire.[251] The resulting model was not a plausible business plan.

First, the Full Build Projections assumed that Sprint would use the same quantity of Clearwire's spectrum, paying by the gigabyte, as Sprint would if it owned the spectrum itself. The evidence at trial showed that Sprint in fact would use less spectrum because paying Clearwire for spectrum had a much higher marginal cost.[252] Under the Full Build

---

[251] JX 1915 at 2 (Clearwire Alternatives presentation).

[252] *See, e.g.*, Tr. 448:6-18 (Schwartz) ("[I]f you build on someone else's network . . . . you end up with a lack of control, so you can't build the network where and when you need it. You end up in a marginal cost situation."); Tr. 1235:21-1236:3 (Hesse) ("[T]he most efficient, from a cost perspective, was spectrum owned—where you had your own network, what we called owner's economics."); Tr. 2798:6-14 (Taylor) ("[M]arginal operating costs per gigabit when you own the network are a lot less.").

Projections, spectrum would cost Sprint an average of $3.30 per gigabyte, compared to less than a dollar if Sprint owned the spectrum.[253] It is implausible that Sprint's demand for spectrum would not decrease in response to this large price increase.[254]

Second, the Full Build Projections assumed that Sprint could extract major price concessions from Clearwire. The Full Build Projections anticipated that Clearwire would accept $2-3 per gigabyte in cost of service payments from Sprint, compared to the $5-6 per gigabyte under the Wholesale Agreement. The Full Build Projections did not explain why Clearwire would cut its prices by 50%. In fact, Clearwire had strongly resisted Sprint's push for a rate reduction during the negotiations over the Wholesale Agreement. The Full Build Projections also assumed that Sprint could "achieve [the] same build on [the] same timeline" without "accounting for friction arising from working with Clearwire."[255] There was likely to be substantial friction, as illustrated by the contentious negotiations over the Accelerated Build.[256]

---

[253] Tr. 2797:24-2798:5 (Taylor).

[254] *See* Tr. 344:9-19 (Cowan) (explaining that Sprint was particularly price-sensitive because Sprint's unlimited data plan meant that Sprint "could get upside-down on a customer basis" if it paid too much to Clearwire); Tr. 2796:6:2797-12 (Taylor) ("Wireless is one of the most elastic things out there. Customers are very price-elastic.").

[255] JX 1915 at 3 (internal quotations omitted).

[256] *See* JX 1981 at 20 (presentation to Sprint's board on June 17, 2013 noting challenges of negotiating ongoing commercial agreement with Clearwire and highlighting Accelerated Build as recent example).

Third, the Full Build Projections had financial holes. They assumed that Sprint would borrow $5 billion at market rates, give the money to Clearwire to build its network, and never get the money back.[257] They also assumed that Clearwire could refinance $4.3 billion in debt "without support from Sprint," which was implausible given Clearwire's financial condition in a scenario where the merger did not close.[258]

Finally, the Full Build Projections assumed that Sprint would pay Clearwire a staggering amount of money. The Full Build Projections forecasted that Sprint would pay Clearwire $20.8 billion in cost of service payments from 2014 to 2018. These payments would decrease Sprint's OIBDA[259] by as much as $12.5 billion.[260] Although Sprint and Softbank technically could have afforded to pursue this value-destructive plan, it is unlikely that they would have done so. They would have found other, less expensive and more profitable options.

Aurelius contended that Sprint and Softbank had no other options and had to pursue the Full Build if the Clearwire-Sprint Merger did not close. Aurelius pointed to growing

---

[257] JX 1983 (Native, "Clearwire Standalone Plan" tab, row 57). While some Sprint documents suggested that Sprint would provide prepayments to fund Clearwire's build-out, the spreadsheets accompanying the Full Build Projections confirmed that Clearwire never paid Sprint back. *See id.*; *accord* JX 1914 at 55.

[258] JX 1914 at 42.

[259] OIBDA is "Operating Income Before Depreciation and Amortization." OIBDA was Sprint's preferred internal metric for measuring its financial performance. It is "effectively the same" as EBITDA. Tr. 1214:14-19 (Schretter); *accord* Tr. 2419:12:20 (Jarrell).

[260] JX 1915 at 4.

customer demand for wireless data and Sprint's lack of access to other sources of spectrum. But the Limited Build demonstrates that Sprint had other options. Like the Full Build, the Limited Build included some herculean assumptions,[261] but it was a starting point for a network plan that did not use as much of Clearwire's spectrum.[262] At the very least, something like the Limited Build offered a "temporary solution" for Sprint and Softbank while they assessed their options.[263]

A temporary solution was all that Sprint and Softbank required. If the Clearwire-Sprint Merger was voted down, they could attempt to acquire Clearwire in the near future on more favorable terms. Sprint and Softbank repeatedly told Clearwire's management and its stockholders that, if the merger was not approved, they would take control of the Clearwire Board, dribble out financing to keep Clearwire out of bankruptcy, and gradually increase Sprint's ownership stake.[264] After the standstill provision of the Equityholders' Agreement expired in November 2013, Sprint and Softbank could acquire Clearwire

---

[261] The Limited Build assumed that Sprint would continue to expand its market share even with reduced tonnage and lower data speeds. Sprint recognized at the time that this assumption was implausible. *See* JX 1978.The Full Build also assumed that Sprint would expand its market share. This assumption remains implausible in the world of the Full Build because Sprint had lost market share in four of the preceding five years. *See* JX 2234 at 56-57.

[262] Sprint's expert on the wireless industry, Carlyn Taylor, believed that the Limited Build "would have been feasible supported by eliminated the Unlimited [data] plan and slowing investments in expanding the subscriber base, along with other potential network design actions to push more 4G traffic on the Sprint owned spectrum." JX 2234 at 65.

[263] JX 1969 (translation).

[264] *See, e.g.*, JX 1654; JX 1686; JX 1695; JX 1801; JX 1840.

without the approval of Clearwire's minority stockholders.[265] They could even structure the acquisition as a tender offer followed by a short-form merger, as Son threatened to do.[266]

The evidentiary record as a whole indicates that Sprint and Softbank would have followed through on these threats. On May 5, 2013, Sprint's finance committee reviewed a proposal to issue Clearwire an additional $1 billion in convertible debt with an exchange price of $2.00 per share. This proposal was based on the funding assumptions of earlier Sprint projections and represented a fraction of the financing called for by the Full Build Projections. Sprint management presented this same financing proposal to Sprint's board of directors on May 30.[267]

In that May 30 meeting, Sprint's board also received a detailed overview of the company's plans in the event that the Clearwire-Sprint merger was voted down. Management told Sprint's directors that Sprint's "2014 4G payments [are] estimated to be approximately $500M."[268] The Full Build Projections forecasted $1.2 billion in 4G payments in 2014.[269] The same presentation also stated that Sprint's "Status Quo" included

---

[265] *See* JX 1686.

[266] *See* JX 1986.

[267] JX 1840 at 41-43.

[268] *Id.* at 38.

[269] The presentation states that the $500 million estimate is "subject to Clearwire build-out and Sprint customer usage." *Id.* Aurelius argues that it is thus consistent with the Full Build. This would be a strange way of phrasing that Sprint's actual payments could be more than twice the figure presented. More likely, the "subject to" proviso reflects that the

"[e]xercise all rights (e.g. change board)," "[c]onsider increasing ownership stake post Standstill," and ongoing "[c]oncerns regarding viability of Clearwire as a standalone entity without additional wholesale customers or financing."[270] All of these proposals suggested a plan to keep Clearwire barely solvent while preparing to acquire Clearwire in the future. None are consistent with the Full Build Projections.

Further support comes from the materials that Sprint management presented to Sprint's board at its meeting on June 17, 2013, when the directors authorized the $5.00 per share offer. Sprint management stated that Sprint's fallback position if it did not acquire Clearwire was "a commercial agreement that would provide access to 2.5 GHz."[271] Sprint management also said that "[t]here was also a possible path to acquiring Clearwire at a later date at a reasonable price."[272] Sprint could not have acquired Clearwire at a "reasonable price" (relative to the $5.00 per share that management asked Sprint's board to authorize) after transferring billions of dollars in value to Clearwire under the Full Build Projections. The context suggests that the commercial agreement management had in mind was a far more limited agreement along the lines presented to Sprint's Board as the "Status Quo" during the May 30 meeting.

---

$500 million figure might change incrementally depending on the pace that Clearwire built out its LTE network and the vagaries of consumer use.

[270] *Id.* at 40.

[271] JX 1981 at 19.

[272] *Id.*

The Full Build Projections did not represent Sprint's plans for Clearwire if the Clearwire-Sprint Merger did not close. Sprint management created the Full Build Projections to convince Softbank to increase the merger consideration by showing what Sprint's business would look like if the merger failed and Sprint nevertheless decided— contrary to the evidence—to use Clearwire's spectrum as Sprint would have if the merger had closed. Sprint and Softbank would not have done that. The Full Build Projections did not reflect Clearwire's operative reality on the date of the merger.

### b. The Single Customer Case

Unlike the Full Build Projections, the Single Customer Case was prepared by Clearwire's management in the ordinary course of business. Clearwire's management had significant experience preparing long-term financial projections, and they regularly updated the Single Customer Case to reflect changes to Clearwire's operative reality.[273] They last updated the Single Customer Case in May 2013 to account for both the Sprint-Softbank Transaction and the then-postponed Accelerated Build.

The key assumptions of the Single Customer Case matched Clearwire's operative reality on the date of the Clearwire-Sprint Merger. The Single Customer case assumed that (i) Sprint would remain Clearwire's only customer, and (ii) Sprint's wholesale payments to Clearwire would increase significantly, but not astronomically, in the future. Aurelius

---

[273] PTO ¶ 177; *see also* Tr. 1694:22-1695:3 (Stanton) ("[W]e had models going back to when I was first involved with the company that reflected what our business was with Sprint as our only wholesale customer and with other wholesale customers.").

does not challenge the first assumption. Clearwire had tried for years to obtain additional customers for years, without success. There was no reason to believe that it would have greater success going forward.

The evidence supports the reasonableness of the amounts that Clearwire management projected for Sprint's wholesale payments. The Single Customer Case forecasted that Sprint would increase its wholesale purchases by over 500% by 2020, or a 22% compound annual growth rate.[274] This large increase accounted for growing customer demand for wireless data and Clearwire's progress in building out a LTE network.

Aurelius argues that Clearwire management should have increased its tonnage forecasts further to account for the Sprint-Softbank Transaction or the prospect of the Accelerated Build. Clearwire's management updated the Single Customer Case in November 2012 and May 2013.[275] On both occasions, they considered whether to increase the tonnage forecasts and decided against it.[276] Those decisions were reasonable. Clearwire management believed that Sprint was unlikely to dramatically increase its use of Clearwire's spectrum unless Sprint acquired Clearwire.[277] As discussed above, this belief was accurate. Clearwire's status quo would not have changed dramatically if the Clearwire-

---

[274] *See* JX 1662 at 13.

[275] *See* JX 962; JX 1712.

[276] JX 2196, Cochran Dep. 248:21-249:1; Tr. 83:13-6 (Schell); Tr. 218:6-219:6 (Hersch); Tr. 1506:13-1507:2 (Stanton).

[277] *See* Tr. 1509:20-1510:21 (Stanton).

Sprint Merger was voted down. Sprint and Softbank would have laid the groundwork for a future acquisition by solidifying their control over the Clearwire Board and gradually increasing their ownership interest in Clearwire through rights offerings and dilutive financings. While customer demand would have required Sprint to make greater use of Clearwire's spectrum in the interim, Sprint would not have paid Clearwire tens of billions of dollars in wholesale payments.

Aurelius also argues that that the Single Customer Case was too low in light of two sets of internal projections that Sprint's board reviewed in September 2012 when considering the Sprint-Softbank Transaction. One set, titled "Long Term Plan – Outlook," forecasted usage-based payments for Clearwire's existing WiMAX network and the LTE network under construction (the "Long Term Projections"). Sprint management told the board that the projections "assume[] that [Clearwire] is self-funding and will reimburse [Sprint] for the costs of deploying 2.5 GHz on 24K [Sprint] sites and [Sprint] will pay $6/GB for 2.5 GHz LTE traffic."[278]

The second set of projections was titled "Long Term Plan – Outlook with 2.5 GHz Build" (the "Build Projections"). The Build Projections assumed that (i) Sprint would host Clearwire's 2.5 GHz spectrum on 24,000 Sprint-owned cell tower sites; (ii) Sprint would pay for the build-out of these sites; (iii) Sprint would pay Clearwire $3.5 billion over the next four years to keep Clearwire solvent, and (iv) Sprint would pay nothing to use the

---

[278] JX 533, at 53.

spectrum hosted on Sprint's cell tower sites.[279] Because of this last assumption, the Build Projections forecasted that Clearwire would receive only $1.65 billion in Sprint wholesale revenue from 2013 through 2016, even less than under the Single Customer Case.

Although the Long Term Projections and the Build Projections forecasted greater tonnage than the Single Customer Case, neither was likely to be implemented. The Long Term Projections were intended as "an extrapolation of current trends" and were not "an operational plan."[280] The Build Projections assumed unrealistically that Sprint could access Clearwire's spectrum for free in exchange for financing the build-out of Clearwire's LTE network. By spring 2013, Sprint regarded the Build Projections as unrealistic.[281]

The Single Customer Case is the most reliable set of projections for assessing Clearwire's operative reality on the date of the Clearwire-Sprint Merger. This decision adopts Cornell's use of the Single Customer Case in his DCF valuation.

---

[279] *Id.*

[280] *Id.* at 33; *see also* JX 338 at 3 (Sprint executive noting that "there is no way Sprint could financially afford to pay" the amounts called for by the Long Term Projections).

[281] *See* JX 1566 at 3 (Sprint presentation noting that 2.5 GHz Build Projections "assume access to spectrum at no cost, but in the past Sprint has not been unable to reach agreement to buy, deploy, or lease spectrum, most recently exhibited in the Accelerated Build Projections."); Tr. 712:20-713:9 (Schwartz) (acknowledging that the no-cost assumption of the 2.5 GHz Build Projections was "very unlikely").

## 2. Perpetuity Growth Rate

The only other significant difference between Cornell and Jarrell's DCF analyses is the perpetuity growth rate.[282] Cornell adopted a perpetuity growth rate of 3.35%, which represents the mid-point of inflation and GDP growth. Jarrell used a perpetuity growth rate of 4.5%, which represents expected GDP growth.

"Without a valid explanation, the use of a generic growth rate is inherently flawed and unreasonable."[283] Jarrell primarily justified his use of GDP growth on Clearwire's strong performance under the Full Build Projections.[284] Because this decision has rejected the Full Build Projections, it rejects Jarrell's proposed perpetuity growth rate.

Cornell's chose the mid-point between inflation and GDP growth because it "take[s] account of all possibilities, from Clearwire becoming "very successful" to it continuing to "struggle along to stay out of bankruptcy."[285] Cornell's choice of the mid-point is, if anything, generous for Clearwire given the likelihood that Clearwire would likely require

---

[282] Tr. 1434:8-11 (Cornell) (attributing about 9% of the difference to this input); Tr. 2455:16-2456:1 (Jarrell) (agreeing with Cornell).

[283] *Dobler v. Montgomery Cellular Hldg. Co.*, 2004 WL 2271592, at *10 (internal quotations omitted), *aff'd in pertinent part, rev'd on other grounds*, 880 A.2d 206 (Del. 2005).

[284] *See* JX 2224 at 128 ("Softbank's investment in Clearwire's largest customer significantly enhanced the probability that Clearwire would be a profitable company in the long term, *as reflected in Sprint's own projections*. Therefore, I assume Clearwire's nominal growth rate into perpetuity is 4.5% annually.") (emphasis added).

[285] Tr. 1428:1-1429:11 (Cornell).

ongoing financing from Sprint to remain solvent under the Single Customer Case.[286] This decision adopts Cornell's 3.35% rate.

### 3.      Discount Rate

The discount rate drives less than 1% of the difference between Jarrell and Cornell's determinations of fair value.[287] Both reach differing conclusions on issues that cut for and against their clients.[288] In light of the minimal impact that the discount rate has on the DCF valuation, this decision will not parse these issues. On the whole, Cornell's analysis is persuasive. This decision adopts his discount rate of 12.44%.[289]

---

[286] *See Golden Telecom*, 993 A.2d at 511 ("[T]he rate of inflation is the floor for a terminal value estimate *for a solidly profitable company that does not have an identifiable risk of insolvency*.") (emphasis added). *Compare* JX 1452 at 99 (Centerview utilizing perpetuity growth rates ranging from 1-3% in its fairness opinion).

[287] Tr. 1434:12-15 (Cornell) (noting that because he and Jarrell "tend to have offsetting disagreements, [the difference in discount rate] accounts for a very small fraction" of the difference); Tr. 2455:16-2456:1 (Jarrell) (agreeing with Cornell and adding that "maybe 1% exaggerates the difference").

[288] Cornell, for example, adopted a lower equity risk premium than Jarrell, which resulted in a lower discount rate and thus increased the value of Clearwire. *See* Tr. 1424:4-1425:12 (Cornell).

[289] Jarrell used a discount rate of 10.22%. The seemingly large delta between his and Cornell's discount rates is misleading and results from their using different sub-species of the DCF analysis. Cornell used the Adjusted Present Value (APV) method, while Jarrell used the more common Weighted Average Cost of Capital (WACC). Cornell believed that the APV method was more appropriate for Clearwire because he did not believe that Clearwire was likely to maintain a constant capital structure under the Single Customer Case, it held below investment grade debt, and Clearwire lacked sufficient taxable income to capture the benefits of interest tax shields. *See* JX 2222 at 33-35.

Both Jarrell and Cornell agree that, in situations where both can be applied, APV and WACC are mathematically identical. The difference lies in the treatment of the interest tax shield. WACC accounts for cost of debt when determining the discount rate. APV

### 4. Unused Spectrum

Aurelius and Sprint agree that a DCF valuation of Clearwire should add value for Clearwire's unused spectrum.[290] They also agree that Clearwire had 40 MHz of unused spectrum,[291] and that DISH's offer to purchase a 40 MHz portfolio in December 2012 (the "DISH Proposal") provides a relevant data point for valuing Clearwire's unused spectrum.

Cornell valued Clearwire's unused spectrum based strictly on the DISH Proposal. The gross value of the DISH Proposal was $2.46 billion. Less deductions for spectrum leases and tax leakage, Cornell estimated that the DISH Proposal would yield net proceeds of approximately $1.98 billion. Cornell adopted this figure as the value of Clearwire's unused spectrum.

Sprint supported Cornell's opinion with a hedonic regression analysis of FCC auction data prepared by Sprint's spectrum valuation expert, Scott Wallsten. Wallsten's

---

discounts a company's cash flows using an all-equity cost of capital and then separately accounts for the value attributable to the interest tax deduction for cash flows. The all-equity cost of capital under APV thus yields a higher discount rate than the blended discount rate under WACC.

Jarrell determined that the WACC-equivalent of Cornell's all-equity discount rate was 10.92%. JX 2236 at 35. The functional difference between the experts' discount rates was no greater than 0.7%.

[290] *See* JX 2222 at 53; JX 2236 at 49; *accord In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 495 (Del. Ch. 1991) (This Court clearly must add the value of non-operating assets to an earnings based valuation analysis.").

[291] Through trial, Aurelius contended that Clearwire had up to 60 MHz of excess spectrum. Aurelius did not raise the matter in post-trial briefing, thereby waiving its argument. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

regression indicated that Clearwire's 2.5 GHz spectrum holdings were worth $.24 per MHz-pop.[292] This figure aligned closely with the DISH Proposal, which valued Clearwire's spectrum at approximately $.22 per MHz-pop. Wallsten's regression also aligned with other third-party offers for Clearwire's 2.5 GHz-spectrum around the valuation date.[293]

Aurelius valued Clearwire's unused spectrum using a complicated model prepared by its valuation expert, Coleman Bazelon. Bazelon's analysis proceeded in three steps. First, Bazelon calculated the national average price of AWS, a spectrum band close to the 2.5 GHz spectrum band. Bazelon based his calculation on a June 28, 2013 transaction in which T-Mobile purchased 10 MHz of AWS spectrum in the Mississippi Valley region from US Cellular for $.96/MHz-pop (the "US Cellular Sale"). Bazelon made a geographic adjustment to this figure and determined that the national average price for AWS spectrum in July 2013 was $1.69 per MHz-pop.

Second, Bazelon converted the national average price for AWS spectrum into a national average price of 2.5 GHz spectrum. To complete this step, Bazelon relied on an engineering model prepared by Andrew Merson, another expert retained by Aurelius. Merson's model calculated the costs associated with deploying different bands of spectrum. According to Merson's model, the $1.69 per MHz-pop national average price of

---

[292] JX 2232 at 39.

[293] *See, e.g.* JX 1579 at 2; PTO ¶ 308 (Verizon's offer in April 2013 to purchase Clearwire spectrum implying a value between $.22-30 per MHz-pop).

AWS implied that the national average price of 2.5 GHz spectrum was $.76 per MHz-pop at the time of the valuation date.

Third, Bazelon converted the national average price of 2.5 GHz spectrum into a value for the Clearwire license holdings covered by the DISH Proposal. Adjusting for geography, Bazelon concluded that this spectrum was worth an average of $.78 per MHz-pop. This produced a total value for Clearwire's excess spectrum of approximately $8.43 billion. By comparison, Cornell's DCF analysis under the Single Customer Case, including his addition of $1.98 billion for a sale of excess spectrum, produced an enterprise value for Clearwire of $7.15 billion.

Bazelon's methodology relied on an extraordinary number of assumptions. To reach his conclusion that Clearwire's excess spectrum was worth $.78 per MHz-pop, Bazelon made $1.68 in adjustments. For his valuation to be accurate, all of the following must be true:

- AWS spectrum is an appropriate comparable to 2.5 GHz spectrum.[294]

- The US Cellular Sale reflected the intrinsic value of the AWS spectrum sold in the transaction.[295]

---

[294] *Compare* JX 1662 at 43 (Clearwire presentation stating that "AWS and 2.5 GHz spectrum are not comparable" because, among other things, "AWS has a more established and developed ecosystem" and "[m]any carriers already own and utilize AWS spectrum for their LTE networks); Tr. 2307:12-17 (Bazelon) (acknowledging that his analysis did not account for the fact that, in 2013, AWS was deployed in handsets but 2.5 GHz spectrum was not).

[295] There is evidence that T-Mobile needed the spectrum to complete its network of AWS spectrum in large cities and paid a premium. *See* JX 2496 at 1 (analyst opining that the US Cellular Sale "is well above what we believe the market value is for similar

- The US Cellular Sale, one transaction for local spectrum licenses, is sufficient to determine the national average value of AWS spectrum and, in turn, 2.5 GHz spectrum.[296]

- Merson's model, a complicated product that also depended on a litany of assumptions, was accurate.[297]

Bazelon's result is also starkly divorced from the market evidence. No third party has ever offered anything close to $.78 per MHz-pop for any of Clearwire's spectrum. Offers from 2011 until the Clearwire-Sprint Merger ranged from $.17 to $.30 per MHz-pop.[298] The DISH Proposal valued Clearwire's excess spectrum at $.22 per MHz-pop. Aurelius tries to distinguish the third-party bids for Clearwire's spectrum as initial offers, rather than final sales prices, but this distinction cannot explain the vast gulf between these bids and Bazelon's calculation. Aurelius also highlights a single e-mail from January 2013

---

spectrum" and attributing the price to the fact that "T-Mobile has some big holes in its AWS spectrum coverage and few ways to plug it"); JX 2080 at 1 (Sprint noting that T-Mobile was "willing to pay a premium" in the US Cellular Sale because "it fits perfectly into their spectrum strategy and existing infrastructure"); *see also* Tr. 1049:5-1052:8 (Bye); Tr. 2740:14-2743:24 (Taylor).

[296] *Cf. In re AT&T Mobility Wireless Operations Hldgs. Appraisal Litig.*, 2013 WL 3865099, at *2 (Del. Ch. June 24, 2013) (rejecting a comparable company analysis based on a single comparable where "the lone comparable company . . . produces an outlier valuation" when compared to an expert's "comparable companies analysis and her discounted cash flow analysis."); *Gholl v. Emachines, Inc.*, 2004 WL 2847865, at *6 (Del. Ch. Nov. 24, 2004) ("When a market analysis is based on only one 'comparable' company and yields such a wide range of results, the Court seriously questions its usefulness.").

[297] Merson revised his initial report after Sprint and Softbank identified numerous errors. After Bazelon revised his report to reflect Merson's corrections, Bazelon's value of Clearwire's spectrum increased by $2.5 billion.

[298] *See* JX 6007 at 24.

where a Sprint executive estimated that Clearwire's spectrum was worth $1.60-2.40 per MHz-pop.[299] There is no evidence in the record as to how the Sprint executive reached these figures,[300] but in any event this unsupported valuation is outweighed by the market evidence.

Aurelius next cites Clearwire presentations to ratings agencies and investors from 2009 to 2011 that assigned a higher value to Clearwire's spectrum,[301] but Clearwire's representations are not the same as market evidence. Clearwire was in fact unable to consummate a spectrum sale because no buyer ever offered anywhere close to the price that Clearwire demanded.

Finally, Aurelius points to recent Sprint transactions and presentations that assigned a greater value for Clearwire's 2.5 GHz. But these Sprint materials accounted for developments after the valuation date, including technological improvements and the emergence of an ecosystem for 2.5 GHz spectrum. The recent Sprint materials are not persuasive evidence of the value of Clearwire's spectrum as of July 8, 2013.

Bazelon's speculative and assumption-laden methodology is not persuasive. This decision adopts Cornell's valuation based on the DISH Proposal.

---

[299] *See* JX 1411.

[300] Sprint withheld relevant materials on grounds of attorney-client privilege. Aurelius requested an adverse inference against Sprint in post-trial briefing, but this is improper. *See* D.R.E. 512(a).

[301] *E.g.*, JX 18 at 10; JX 119 at 6.

### 5. The Result of the DCF Valuation

As noted, it is "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record."[302] The court adopts Cornell's DCF valuation in full. The fair value for Clearwire on the date of the merger was $2.13 per share.

## IV. CONCLUSION

The defendants proved for purposes of the fiduciary analysis that the Clearwire-Sprint Merger was entirely fair. They also proved for purposes of the appraisal proceeding that the fair value of Clearwire on the closing date was $2.13 per share. The legal rate of interest, compounded quarterly, shall accrue on the appraised value from the date of closing until the date of payment. The parties shall cooperate on preparing a final order for the court. If there are additional issues for the court to resolve before a final order can be entered, the parties shall submit a joint letter within two weeks that identifies them and recommends a schedule for bringing this case to conclusion, at least at the trial court level.

---

[302] *M.G. Bancorporation*, 737 A.2d at 526.